**COALITION FOR ECONOMIC EQUITY, et al., Plaintiffs,**

v.

**Pete WILSON, et al., Defendants.**

**No. C 96–4024 TEH.**

United States District Court, N.D. California.

Dec. 23, 1996.

Edward M. Chen, American Civil Liberties Union, Foundation of Northern CA Inc., San Francisco, CA, Mark D. Rosenbaum, David S. Schwartz, Taylor Flynn, Silvia Argueta, Daniel Tokaji, ACLU Foundation of Southern California, Los Angeles, CA, William C. McNeill, III, Julian A. Gross, Employment Law Center, Legal Aid Society of S.F., San Francisco, CA, Stewart Kwoh, Julie Su, Asian Pacific American Legal Center of Southern CA, Los Angeles, CA, Evan H. Caminker, University of California at Los Angeles, School of Law, Los Angeles, CA, Eva J. Paterson, Theodore Hsien Wang, Lawyers Committee For Civil Rights of San Francisco Bay Area, San Francisco, CA, Julie Goldscheid, Martha F. Davis, NOW Legal Defense and Education Fund, New York, NY, Karl M. Manheim, Loyola Law School, Los Angeles, CA, Abby J. Leibman, California Women's Law Center, Los Angeles, CA, Judith E. Kurtz, Equal Rights Advocates, Inc., San Francisco, CA, Joseph S. Avila, Avila & Putnam, Los Angeles, CA, Elliot M. Mineberg, People For the American Way, Washington, DC, Christopher F. Edley, Jr., Harvard Law School, Cambridge, MA, Brad Seligman, The Impact Fund, Berkeley, CA, for The Coalition for Economic Equity, California NAACP, Northern California NAACP, AFL-CIO, Council of Asian American Business Associations, CA, Chinese American Citizens' Alliance, Women Construction Business Owners and Executives, California Chapter, United Minority Business Entrepreneurs, Chinese for Affirmative Action, Black Advocates in State Service, Asian Pacific American Labor Alliance, LaVoz Chicana, Black Chamber of Commerce of California, Michelle Bennett, Nancy Burns, Floyd Chavez, Christopher Clay, Dana Cunningham, Iran Celeste Davila, Shevada Dove, Jessica Lopez, Virginia Mosqueda, Salvador Ochoa, Clifford Tong.

Glenn Rothner, Ellen Greenstone, Rothner Segall & Bahan, Pasadena, CA, for California Labor Federation.

Linda Cabatic, CA State Atty. General, Sacramento, CA, for Pete Wilson, Daniel E. Lungren, Joanne Corday Kozberg, James Gomez.

Joseph R. Symkowick, CA State Dept. of Education, Sacramento, CA, Joanne Lowe, Deputy General Counsel, Sacramento, CA, for Delaine Easton.

C. Ellen Pilsecker, Ian Fan, San Diego, CA, for San Diego County.

Victor J. Westman, County Counsel, Martinez, CA, Phillip S. Althoff, Martinez, CA, for Contra Costa County.

Thomas G. Hendricks, County Counsel's Office, San Rafael, CA, for Marin County.

Nicholas George–Rodriguez, Lawrence S. Newberry, Tracy Webb, City Attorney's Office, Pasadena, CA, for City of Pasadena.

Manuel S. Klausner, Kindel & Anderson, Los Angeles, CA, Sharon L. Browne, Mark T. Gallagher, Pacific Legal Foundation, Sacramento, CA, Michael A. Carvin, Charles J. Cooper, Cooper & Carvin, Pllc., Washington, DC, for Californians Against Discrimination and Preferences, Inc.

Colleen M. Rohan, San Francisco, CA, for Amicus Curiae Meiklejohn Civil Liberties Institute.

Manuel S. Klausner, Kindel & Anderson, Los Angeles, CA, Donna G. Matias, Institute for Justice, Washington, DC, for Amicus Curiae Institute for Justice, Women's Freedom Network, Campaign for a Color–Blind America, Center for Equal Opportunity, U.S. Pan-Asian American Chamber of Commerce Education Foundation, Pacific Research Institute, Center for New Black Leadership, Claremont Institute.

Christopher M. Patti, University Of California, Office of the General Counsel, Oakland, CA, for Richard C. Atkinson.

Tina L. Rasnow, Tina L. Rasnow & Associates, Westlake Village, CA, for Amicus Curiae California Women Lawyers.

*FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER RE PRELIMINARY INJUNCTION*

THELTON E. HENDERSON, Chief Judge.

## I. INTRODUCTION

This action presents a challenge to the constitutionality of newly-enacted Article 1, section 31 of the California Constitution. This measure, which appeared on the ballot as Proposition 209, was passed by the California electorate on November 5, 1996. It provides in relevant part as follows:

> The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

CAL. CONST. art. 1, § 31(a).[1]

It is important to note at the outset that much of this language simply reaffirms existing anti-discrimination protections already provided by the United States and California Constitutions, and by the 1964 Civil Rights Act. These laws have long-guaranteed all persons "equal protection of the law," and prohibited discrimination in employment and in any program or activity receiving federal assistance.[2] This aspect of Proposition 209—which creates no change in existing law—is not at issue in this case. Indeed, it could hardly be more clear that a law that merely affirms the non-discrimination principles in our Constitution is, itself, constitutional.

It is also undisputed that the Constitution precludes voluntary, government-sponsored race and gender "preferences" except in the most limited circumstances. Thus, government entities were already barred, prior to Proposition 209, from using race-conscious "preferences," e.g. race-conscious affirmative action programs, unless they could pass the most exacting "strict

---

1. For the sake of brevity, the Court will use the term "race" to cover all of the categories identified in Proposition 209 other than sex.

2. The Fourteenth Amendment and § 7(a) of the California Constitution both provide that no person may be denied "the equal protection of the laws." Titles VI and VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000d–e et seq. prohibit, respectively, discrimination in any project or activity receiving federal financial assistance on the basis of race, and in employment on the basis of race and sex. As the ballot argument in favor of Proposition 209 noted, the initiative "restates the historic Civil Rights Act." Pls. Exh. 2.

scrutiny" required by the Fourteenth Amendment. Under this test, only those programs that are "*narrowly* tailored" and "*necessary* to break down patterns of *deliberate* exclusion" perpetuated by the enacting agency are permitted. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509, 109 S.Ct. 706, 730, 102 L.Ed.2d 854 (1989) (emphasis added).[3] Quotas are not permitted. *See, e.g., Regents of the Univ. of Calif. v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Gender-based programs, under existing law, are also subject to a heightened level of scrutiny. *U.S. v. Virginia*, — U.S. —, —, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996).

In short, Congress and the courts had already prohibited discrimination, and sharply constrained government use of race and gender preferences, long before Proposition 209 was enacted on November 5, 1996. The parties do not dispute, however, that the people of California meant to do something more than simply restate existing law when they adopted Proposition 209. It is this "something more" that is the focus of this action.

To be sure, the outer boundaries of this "something more" have yet to be determined. It is clear, however, that the primary change Proposition 209 makes to existing law is to close that narrow but significant window that permits the governmental race- and gender-conscious affirmative action programs described above that are still permissible under the United States Constitution. Notably, defendants agreed at oral argument that Proposition 209 prohibits at least some of these constitutionally permissible programs. They also failed to identify any other programs that would be affected by Proposition 209.

It is thus essential to keep in mind that plaintiffs' constitutional challenge to Proposition 209 is not, in fact, a facial challenge to the entire initiative. Rather, it is much narrower in scope: it is a challenge only to that slice of the initiative that now prohibits governmental entities at every level from taking voluntary action to remediate past and present discrimination through the use of constitutionally permissible race- and gender-conscious affirmative action programs.[4]

Plaintiffs assert that *this specific aspect* of Proposition 209 violates the United States Constitution on two separate grounds. First, they allege that Proposition 209, although couched in neutral terms, violates the Fourteenth Amendment's equal protection guarantee of "the right to full participation in the political life of the community." *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 467, 102 S.Ct. 3187, 3193, 73 L.Ed.2d 896 (1982); *see also Romer v. Evans*, — U.S. —, —, 116 S.Ct. 1620, 1628, 134 L.Ed.2d 855 (1996) ("Central ... to our own Constitution's guarantee of equal protection is the principle that government in each of its parts remain open on impartial terms to all who seek its assistance."). Proposition 209 violates this guarantee, they argue, because it restructures the political process in a non-neutral manner. Specifically, it erects unique political hurdles only for those seeking legislation intended to benefit women and minorities—who must now obtain a constitutional amendment—while allowing those seeking preferential legislation on any other ground unimpeded access to the political process at all levels.

---

**3.** The city of San Francisco, for example, adopted a race- and gender-conscious affirmative action program after finding that it was necessary to counter established discriminatory practices, including "old boy networks," that prevented minority and women contractors from obtaining city contracts. *Associated Gen. Contractors of Calif. v. Coalition for Economic Equity*, 950 F.2d 1401, 1413–18 (9th Cir.1991).

**4.** We note that while the exact relationship between the terms "affirmative action" and "preferences" has yet to be determined, the following is clear. First, the term "preferences" includes, at a minimum, programs or policies that use racial or gender classifications. Second, the term "affirmative action" is generally understood to include, at a minimum, programs designed to remedy the continuing effects of past and/or present discrimination which contain a race- or gender-conscious component. The term "affirmative action" as used in this decision is intended to refer to such programs. However, to ensure clarity on this point, and because the term "affirmative action" may be used in other contexts to refer to programs that are not race- or gender-conscious, the Court will generally use the longer, but more precise, phrase "race- and gender-conscious affirmative action" to refer to programs affected by Proposition 209.

Second, plaintiffs allege that Proposition 209 violates the Supremacy Clause of the United States Constitution because it interferes with Congress' intent that employers be afforded the option of utilizing constitutionally permissible race- and gender-conscious affirmative action to comply with their obligations under Titles VI and VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972.

■ The immediate issue before the Court is whether plaintiffs[5] have satisfied their burden of demonstrating that defendants[6] should be preliminarily enjoined from enforcing or implementing Proposition 209 pending a final determination of the merits of this action. In weighing this matter, the Court is mindful that any challenge to a duly-enacted law should be met with caution and restraint. It is not for this or any other court to lightly upset the expectations of the voters. At the same time, our system of democracy teaches that the will of the people, important as it is, does not reign absolute but must be kept in harmony with our Constitution.

Thus, the issue is not whether one judge can thwart the will of the people; rather, the issue is whether the challenged enactment complies with our Constitution and Bill of Rights. Without a doubt, federal courts have no duty more important than to protect the rights and liberties of all Americans by considering and ruling on such issues, no matter how contentious or controversial they may be. This duty is certainly undiminished where the law under consideration comes directly from the ballot box and without the benefit of the legislative process. As the

Supreme Court aptly noted in another socially-charged case:

> Nor does the implementation of ... change through popular referendum immunize it [from constitutional scrutiny]. The sovereignty of the people is itself subject to those constitutional limitations which have been duly adopted and remain unrepealed.

*Hunter v. Erickson,* 393 U.S. 385, 392, 89 S.Ct. 557, 561, 21 L.Ed.2d 616 (1969).

It also cannot be overemphasized that this case does not call upon this Court to adjudicate whether affirmative action is right or wrong, or whether it is no longer an appropriate policy for addressing the continuing effects of past and present discrimination against racial minorities and women. Such questions, while they are most certainly of vital public policy interest, lie beyond the purview of this Court. Nor does this case implicate the ability of governmental entities to voluntarily repeal affirmative action policies, as the Regents of the University of California did earlier this year.

Rather, the substantive issues raised by this action are considerably more narrow, albeit no less important: whether the particular *method* chosen by Proposition 209 to curtail affirmative action is unlawful because it either (1) violates the rights of women and minorities to fully participate in our political system or (2) interferes with Congressional goals embodied in Titles VI and VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.

In the discussion that follows, this Court first addresses the question of whether plaintiffs have standing to bring this action. The

---

5. Pursuant to this Court's Order of November 25, 1996, plaintiffs represent a class of all persons or entities who, on account of race, sex, color, ethnicity, or national origin, are or will be adversely affected by Proposition 209's prohibition of affirmative action programs operated by the State of California, any state or municipal agency, or any other political subdivision or governmental instrumentality of the State of California.

The plaintiff class is represented by named plaintiffs Coalition for Economic Equity, California NAACP, Northern California NAACP, California Labor Federation, AFL–CIO, Council of Asian American Business Associations, California Chinese American Citizens' Alliance, California

Chapter of the Women Construction Business Owners and Executives, United Minority Business Entrepreneurs, Chinese For Affirmative Action, Black Advocates in State Service, Asian Pacific American Labor Alliance, La Voz Chicana, Black Chamber of Commerce of California, and several named individuals.

6. Pursuant to this Court's Order of December 16, 1996, defendants represent a class of all state officials, local government entities or other governmental instrumentalities bound by Proposition 209. The defendant class is represented by named defendants Governor Pete Wilson and Attorney General Daniel Lungren.

Court then turns to the appropriate standard governing plaintiffs' motion for a preliminary injunction, which is followed by this Court's Findings of Fact and Conclusions of Law, with respect to that motion, as required by FED.R.CIV.P. 65.

Based on these Findings and Conclusions, this Court rules that:

(1) Plaintiffs have standing to bring this action.

(2) Plaintiffs have demonstrated a probability of success on their claim that Proposition 209 violates the Fourteenth Amendment's equal protection guarantee to full participation in the political life of the community.

(3) Plaintiffs have failed to demonstrate a likelihood of success on their claim that Proposition 209 violates the Supremacy Clause because it conflicts with, and is thus preempted by, Title VI of the 1964 Civil Rights Act and Title IX of the Education Amendments of 1972.

(4) Plaintiffs have demonstrated a likelihood of success on their claim that Proposition 209 violates the Supremacy Clause because it conflicts with, and is thus preempted by, Title VII of the 1964 Civil Rights Act.

(5) Plaintiffs have demonstrated that a preliminary injunction is necessary to protect the plaintiff class from the possibility of irreparable injury.

Accordingly, the Court grants plaintiffs' Motion for Preliminary Injunction, and enjoins defendants, pursuant to the injunction following these Findings and Conclusions, from enforcing and implementing Proposition 209 pending trial or final judgment in this action.

## II. STANDING

■ A "threshold question in every federal case [is] whether the plaintiff has stated a 'case or controversy' between himself and the defendant within the meaning of Article III." *Warth v. Seldin,* 422 U.S. 490, 498, 95

S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The core component of whether a case or controversy under Article III exists is the doctrine of standing. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). The Supreme Court has established three elements necessary to meet the Article III standing requirement. First, the plaintiff must have suffered an "injury in fact"— "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' . . . and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). Second, the injury must be a result of the challenged conduct. *See, e.g. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) ("The injury has to be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.' "). Finally, a plaintiff must show a likelihood that a favorable decision will redress the injury. *Id.*

■ Here, defendants assert that none of the plaintiffs shows an imminent threatened injury. Notwithstanding the limitations imposed by article 3, section 3.5 of the California Constitution,[7] however, Proposition 209 is a self-executing amendment to the California Constitution that imposes an affirmative duty to comply. "In this circumstance compliance is coerced by the threat of enforcement, and the controversy is both immediate and real." *Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 508, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972).

■ Plaintiffs have shown a real and immediate threat of injury. Proposition 209 is clearly applicable to statutes and programs that are currently benefitting the named plaintiffs and it is virtually certain to be enforced. The amendment was recently enacted and is not a statute that has lain dor-

---

7. Section 3.5 of Article 3 of the California Constitution provides that an administrative agency is without power to declare a statute unconstitutional unless an appellate court has first made a determination that the statute is unconstitutional.

Thus, state agencies may not declare a state statute invalid under Proposition 209, or otherwise refuse to enforce a state statute based on Proposition 209, absent a state appellate court ruling that the statute is unconstitutional.

mant for years and likely to remain moribund. *See Poe v. Ullman,* 367 U.S. 497, 501, 81 S.Ct. 1752, 1754–1755, 6 L.Ed.2d 989 (1961). Further, the Governor has already made moves to employ article 1, section 31, to invalidate certain state statutes in a pending civil action. *Wilson v. State Personnel Board,* 96–CS01082 (App. to File Mot. to Amend, Nov., 6 1996). Moreover, a conflict between the plaintiffs' interests and the challenged amendment is inevitable. *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297–305, 99 S.Ct. 2301, 2308–2312, 60 L.Ed.2d 895 (1979) ("One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough."); *cf. Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215–1216, 39 L.Ed.2d 505 (1974) (a plaintiff need not first expose himself to actual arrest or prosecution before challenging the constitutionality of a criminal statute).

The constitutional injury asserted by the plaintiffs is directly connected to the actions of the defendants. *See S. v. D.,* 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973) (quoting *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)) ("The party who invokes judicial power must be able to show that he has sustained or is immediately in danger of sustaining some direct injury as a result of a statute's enforcement."). Two of the defendants, and now class representatives, the California Governor and Attorney General, are explicitly charged with the task of enforcing the laws of the state. The other defendants are governmental entities that are under a duty to apply the amendment to existing statutes, ordinances, and regulations. Plaintiffs have shown that they will suffer the alleged constitutional injury when any one of the defendants enforces the constitutional amendment.

Finally, since the constitutional injury to the plaintiffs is allegedly caused by the enforcement of Proposition 209, plaintiffs' requested remedy, a declaration that the Proposition is unconstitutional and unenforceable, would unquestionably address the plaintiffs' alleged injuries. *See Allen v. Wright,* 468 U.S. 737, 753, n. 19, 104 S.Ct. 3315, 3325, n. 19, 82 L.Ed.2d 556 (1984) (the redressability requirement "examines the causal connection between the alleged injury and the judicial relief requested").

By demonstrating imminent injury attributable to the actions of the defendants that will be redressed by a favorable decision by this Court, plaintiffs have met the requirements for standing under the Article III "case or controversy" clause.[8]

### III. PRELIMINARY INJUNCTION STANDARD

According to Ninth Circuit precedent, in order to obtain a preliminary injunction, the moving party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the movant. *Associated General Contractors,* 950 F.2d at 1410. These formulations are not different tests but rather two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. *Id.* In considering a request for a preliminary injunction, a court must remain mindful that such relief is aimed primarily at preserving the status quo pending trial. *See Los Angeles Mem. Coliseum Comm'n v. National Football League,* 634 F.2d 1197, 1200 (9th Cir.1980) ("fundamental principle" governing preliminary injunctive relief is the need to maintain the status quo prior to determination on the merits). Under either formulation of the test, a court, in

---

**8.** At the outset, this Court must address defendants' contention that these proceedings should be stayed under the *"Pullman* abstention" doctrine. *Railroad Comm'n of Tex. v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). After having carefully reviewed the circumstances that defendants have forwarded in support of their request for abstention, this Court

chooses not to abstain. Defendants have not presented an interpretation of challenged state law that this Court, in its discretion, believes warrants abstention. This Court, however, will revisit this area and consider all subsequent developments and arguments when it considers defendants' regularly noticed motion to abstain scheduled for January 6, 1997.

balancing the harms, must also take into account any public interests implicated by the injunctive relief sought. *Caribbean Marine Services Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988).

 Because the plaintiffs here allege that they suffer constitutional injury at the hands of Proposition 209, the Court must evaluate the merits of their constitutional claims before it can meaningfully address the irreparability and imminence of any harm. *See Bery v. City of New York,* 906 F.Supp. 163, 166 (S.D.N.Y.1995) (where constitutional injury is alleged, "the two prongs of the threshold showing required for injunctive relief merge into one"), *rev'd on other grounds,* 97 F.3d 689 (2d Cir.1996).

## IV. FINDINGS OF FACT

The following Findings of Fact are based on the preliminary record presently before the Court.

### A. Characterization of Proposition 209

After qualifying as an initiative constitutional amendment, Proposition 209 was placed on the California general election ballot for November 5, 1996.

Prior to the election, each registered voter received an official California Ballot Pamphlet prepared by the non-partisan California Legislative Analyst's Office ("LAO").[9] This Pamphlet, which provided an official description and analysis of each statewide initiative, portrayed Proposition 209 as a measure that would eliminate race- and gender-conscious affirmative action programs in the public sector.[10] Accordingly, the California Ballot Pamphlet explained to voters that:

A **YES** vote on [Proposition 209] means: The elimination of those affirmative action programs for women and minorities run by the state or local governments in the areas of public employment, contracting, and ed-

ucation that give "preferential treatment" on the basis of sex, race, color, ethnicity, or national origin.

A **NO** vote on this measure means State and local government affirmative action programs would remain in effect to the extent they are permitted under the United States Constitution.

Pls. Exh. 2 (emphasis in original).

In addition to this brief summary, the Ballot Pamphlet also provided voters with a more extensive analysis of Proposition 209, which underscored that the initiative would effectively eliminate race- and gender-conscious affirmative action programs. Specifically, the LAO explained Proposition 209 and its effects as follows:

[F]ederal, state, and local governments run many programs intended to increase opportunities for various groups—including women and racial and ethnic minority groups. These programs are commonly called "affirmative action" programs....

If [Proposition 209] is approved by the voters, it could affect [the following programs]....

#### Public Employment and Contracting

The measure would eliminate affirmative action programs used to increase hiring and promotion opportunities for state or local government jobs, where sex, race, or ethnicity are preferential factors in hiring, promotions, training or recruitment decisions. In addition, the measure would eliminate programs that give preference to women-owned or minority-owned companies on public contracts....

#### Public Schools and Community Colleges

[T]he measure could eliminate, or cause fundamental changes to, *voluntary* desegregation programs run by school dis-

---

**9.** The Legislative Analyst is required, pursuant to the California Elections Code, to prepare a "concise summary" of the general meaning of each initiative as well as an analysis. CAL.ELEC.CODE §§ 9085–86.

**10.** In formulating this description, the LAO extensively reviewed materials pertaining to Propo-

sition 209, including "documents from proponents and opponents, journal articles, media coverage, legislative hearings, numerous conversations with proponents, opponents, government officials and other experts." Pls. Exh. 2, Taylor Decl. ¶ 2.

tricts.... Examples of desegregation spending that could be affected by the measure include the special funding given to (1) "magnet" schools (in those cases where race or ethnicity are preferential factors in the admission of students to the schools), and (2) designated "racially isolated minority schools" that are located in areas with high proportions of racial or ethnic minorities....

In addition, the measure would affect a variety of public school and community college programs such as counseling, tutoring, outreach, student financial aid, and financial aid to selected school districts in those cases where the programs provide preferences to individuals or schools based on race, sex, ethnicity, or national origin....

**University of California and California State University**

The measure would affect admissions and other programs at the state's public universities. For example, the California State University ("CSU") uses race and ethnicity as factors in some of its admissions decisions. If this initiative is passed by the voters, it could no longer do so....

*Id.* (emphasis in original). As the above reflects, the only programs identified by the LAO as potentially affected by Proposition 209 are race- and gender-conscious affirmative action programs.

The California Ballot Pamphlet also included partisan arguments submitted by proponents and opponents of the initiative. These arguments further established that the issue at stake in Proposition 209 was the continuation of public sector race- and gender-conscious affirmative action programs. The Argument In Favor Statement begins

by instantly focusing the reader on the issue of affirmative action:

A generation ago, we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides.

Pls. Exh. 3. The next paragraph quotes the facially-neutral language of the initiative but then immediately returns to the issue of affirmative action, with a particular emphasis on race-conscious affirmative action:

"REVERSE DISCRIMINATION" BASED ON RACE OR GENDER IS PLAIN WRONG!.... [S]tudents are being rejected from public universities because of their RACE. Job applicants are turned away because their RACE does not meet some "goal" or "timetable." Contracts are awarded to high bidders because they are of the preferred RACE ... Proposition 209 will stop [these] terrible programs....

*Id.* (emphasis in original).[11]

The Argument Against Statement also focused attention on Proposition 209's impact on affirmative action programs beneficial to women and minorities. The argument warns that:

Proposition 209 will eliminate affirmative action programs ... that help achieve equal opportunity for women and minorities....

and concludes by stating that Proposition 209:

poses as an equal opportunities initiative, but ... [it] puts at risk every outreach program, sets back the gains made by

---

11. Ward Connerly, co-signer of this ballot argument, also made it clear in his public statements that Proposition 209 was intended to end affirmative action programs. In March 1996, for example, Connerly explained to reporters why he had decided against trying to end racial preferences in the University of California's ("UC") outreach programs for high school students and financial aid criteria: "Connerly said Wednesday that UC had already been torn apart by his successful push last summer to end racial preferences in admissions and hiring, and that affirma-

tive action programs in California schools would most likely be banned anyway by [Proposition 209]. 'What do I gain by going ahead and forcing a showdown ...[?] The public's going to end affirmative action in November.'" Pls. Exh. 4. Governor Wilson, another co-signor of the ballot initiative, also told reporters in March of 1995 that although the California Legislature was unwilling to "confront the issue of reverse discrimination arising from affirmative action programs ... the people of California will get that opportunity at the ballot box." *Id.*

women and puts' the brakes on expanding opportunities for people in need. *Id.* (quoting General Colin Powell).

## B. Election Results and Response by Defendants

On November 5, 1996, the voters of California enacted Proposition 209 into law, with 4,736,180 votes (54%) cast in favor of the initiative and 3,986,196 votes (46%) cast in opposition.[12] Because the initiative is by its terms self-executing, public entities around the State faced the immediate question of implementation. Three of the defendants in this action responded by quickly acting to implement and enforce Proposition 209. On November 6, 1996, Governor Wilson issued an Executive Order (W–136–96) requiring state agencies to promulgate implementing regulations and identify all state statutes and programs pertaining to employment, education or contracting that grant or encourage preferences based on race, sex, color, ethnicity or national origin.[13] That same day, Attorney General Lungren instructed state agencies to comply immediately with Proposition 209 to the extent permitted by California law.[14] The University of California also promptly took steps to implement Proposi-

tion 209. *See* Dec. 6, 1996 Order at 2.[15] Other defendants expressed uncertainty and confusion regarding the appropriate response to the initiative. *See* Response of Defendant City of Pasadena to Plaintiffs' Request for Temporary Restraining Order at 2 ("[C]omplex questions now exist about how to reconcile the competing and seemingly conflicting requirements of federal, state and local affirmative action policies. These are issues which this City cannot resolve on its own.").

## C. Effect of Proposition 209 on Affirmative Action Programs

Any California public entity that implements Proposition 209 is required to end voluntary race- and gender-conscious affirmative action programs in three areas: contracting, employment, and education. We thus briefly review each of these areas in turn.[16]

### 1. Contracting

Race- and gender-conscious affirmative action programs in California in the area of public contracting have taken various forms, from requiring that prime contractors make good-faith efforts to utilize women- or minor-

---

12. The racial and gender breakdown of the vote was as follows:

| VOTER | YES(%) | NO(%) |
| --- | --- | --- |
| Male | 61% | 39% |
| Female | 48% | 52% |
| | | |
| White | 63% | 37% |
| Black | 26% | 74% |
| Latino | 24% | 76% |
| Asian | 39% | 61% |

Pinkus Decl. and attachment. As the above reflects, none of the above groups voted entirely for or against Proposition 209. However, "White voters were the only racial or ethnic group supporting 209." *Id.*

13. Prior to the November election, Governor Wilson filed suit in Sacramento Superior Court (96–CS01082) against state agencies challenging the constitutionality of certain affirmative action programs. After the election, Governor Wilson promptly moved to amend his suit to include Proposition 209 as a basis for invalidating the challenged programs. On November 14, 1996, the California Court of Appeal ruled that the amendment could not be made pending resolution of a writ petition on a judicial disqualification order. However, Governor Wilson intends to add a Proposition 209 claim to the case "at

the earliest available opportunity." Defendants' Supplemental Memorandum in Opposition to Motion for Preliminary Injunction at 5 n. 2.

14. We also note that on November 25, 1996, the Governor and Attorney General both declined to agree to a moratorium on actions to enforce Proposition 209 pending further proceedings in this case. *See* Order Re Temporary Restraining Order, November 27, 1996, at 6.

15. Given the self-executing nature of Proposition 209, all other members of the defendant class are also required to implement Proposition 209 immediately. *See* CAL. CONST. art. 1, § 31(h).

16. The record in this case includes references to a range of affirmative action programs currently in effect in California. Some of these programs have been subjected to judicial challenge and found to be constitutionally permissible. *See, e.g., Assoc. General Contractors v. Coalition for Econ. Equity,* 748 F.Supp. 1443 (N.D.Cal.1990), *aff'd,* 950 F.2d 1401 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). Others have never been challenged. With respect to these latter programs, the Court does not, of course, make any judgment with respect to their constitutionality.

ity-owned subcontractors to providing an advantage in evaluating bids. These programs are designed to address the continuing effects of past or present bias against the use of women- and minority-owned contractors on public sector projects. According to the evidence before the Court, their effect has been to provide such contractors with substantial opportunities not previously available.

The experience of Antonio Ruiz provides one such example. Mr. Ruiz owns Ruiz Construction Company & Associates which engages in general engineering and construction work. Amended Ruiz Decl. filed in support of *amicus* ¶ 2. It is Mr. Ruiz' experience that "contractors accept the bids of those contractors with whom they have established ties." *Id.* ¶ 8. In 1985, Ruiz qualified to participate in the city of San Francisco's voluntary affirmative action program, which was adopted to remedy past discriminatory practices by the city in its letting of contracts. Prior to this time, Ruiz was unable to "get many large contractors to even accept [his] bids for subcontract work," and he in fact had obtained "only one contracting job with the City." ¶¶ 7–8. By participating in the City's affirmative action program, he was able to break through the old patterns of doing business and obtain subcontracts. ¶¶ 10–11. The exposure he gained led to additional business with prime contractors, and allowed him to build his business substantially and "form joint ventures to bid as a prime contractor on City contracts." ¶¶ 12–14. *See also* Fung Decl. ¶ 4 (affirmative action in public contracting has reduced discrimination against Asian American contractors and made it possible for them to bid competitively for public contracts); Wu Decl. at 144–145 (affirmative action in public contracting has substantially benefitted Asian Americans); Burns Decl. ¶ 4 (women-owned painting and wallpapering company benefitted substantially from San Francisco affirmative action contracting program); Chavez Decl. ¶¶ 3–4 (describing how affirmative action in public contracting programs allowed him to break through the "old boy network" and obtain public contracts); Larson Decl. ¶ 16 (disparities between the availability of women- and minority-owned contractors and

their use by public agencies "are noticeably reduced where government agencies implement affirmative action policies"), ¶ 20 (after Los Angeles adopted affirmative action programs, percentage of women businesses obtaining city contracts increased from 0.3% to 8% and percentage of minority businesses obtaining city contracts increased from 2% to 11.8%).

The record further demonstrates that implementation of Proposition 209 would substantially reduce opportunities in public contracting for women and minorities. Larson Decl. ¶ 17 (discussing studies showing that race or gender neutral programs designed to address underutilization of minority and women contractors were generally ineffective), ¶ 21; Chavez Decl. ¶ 5 (estimating that absent affirmative action program "his firm would lose up to 50 to 75% of" its public contracting work); Leonard Decl. ¶ 15 (discussing a study finding "not only a stagnation but a reversal of advances" for African–Americans under "weak" affirmative action programs).

### 2. Employment

Race- and gender-conscious affirmative action programs in California in the area of public employment generally allow an employer to consider the ethnicity or gender of an otherwise qualified applicant as one of many factors. Some programs may also utilize hiring goals. Such programs are typically designed to address the continuing effects of past or present bias against the hiring and/or promotion of women and minority employees. According to the evidence before the Court, their effect has been to provide such employees with substantial opportunities not previously available.

The use of voluntary affirmative action in California's civil service provides one such example. In 1971, then-Governor Ronald Reagan issued an Executive Order establishing voluntary affirmative action in the California civil service. Bielby Decl. ¶ 4. Subsequently, state agencies and departments began using hiring goals and timetables in an effort to correct the existing underutiliza-

tion of women and minorities.[17] As a consequence, the "index of gender and race segregation in state agencies" declined by 11 and 16 percent respectively between 1979 and 1986. ¶ 5. *See also* Newmann Decl. ¶ 7 (period from 1979–85 showed substantial statistical increases in the rate of female representation in the California "civil service and an even greater increase in nonwhite representation"); Badget Decl. ¶ 6 ("After state and federal governments began to require that state and local employers execute affirmative action plans in the early 1970s, the representation of Latino and black women increased dramatically as did access to managerial and professional jobs for all women of color."); Grillo Decl. ¶¶ 1–4 (affirmative action guidelines have been "very important" in enabling women and minorities to gain civil service positions in California).

The record also indicates that implementation of Proposition 209 would substantially reduce opportunities for women and minorities in public employment.

### 3. Education

Race- and gender-conscious affirmative action programs in California in the area of public education range from voluntary desegregation and "magnet school" programs at the elementary school level to financial aid and admissions programs at the college and graduate school level. The evidence before the Court demonstrates that, overall, these programs have benefited minorities and women.

The University of California provides one example. Where the number of eligible applicants exceeds the spaces available, the University of California campuses select between 40 and 60% of students based upon their grades, test scores and course work.

The remaining selections are made using a combination of criteria including California residence, physical and learning disabilities, educational disadvantage, family income, ethnicity, leadership ability, public service, special athletic, artistic or musical ability, composition of a student's family (whether student comes from a single- or two-parent family) and a student's family's college history (whether student is first-generation college bound).

Under this system of admissions, the racial composition of the total University of California freshman class for the Fall of 1994 was as follows:

| | number | percentage |
| --- | --- | --- |
| American Indian | 214 | .96 |
| African American | 968 | 4.35 |
| Latino | 3,313 | 14.87 |
| Filipino | 949 | 4.26 |
| Asian | 7,191 | 32.28 |
| White/other | 9,643 | 43.28 |
| total: | 22,278 | 100.00 |

Conrad Decl. ¶ 15.

The record indicates that, without the present race- and gender-conscious affirmative action efforts, the number of African American enrollments "could be reduced across the system by as much as 40 to 50 percent while Chicano/Latino enrollments could be reduced by 5 to 15 percent.... American Indian enrollments could be reduced by 40 to 50 percent. Filipino enrollments could increase by 5 percent or decline by 5 percent." Pls. Exh. 7 at i. On the other hand, Asian American enrollments would increase by 15 to 25 percent. White enrollments would likely remain roughly the same. *Id.*[18]

The above estimates may well understate the actual decreases that would occur over time. As acceptance rates fall for African American, Latino and American Indian stu-

17. State civil service affirmative action programs "encourage some consideration of race, ethnicity and gender in hiring qualified civil service applicants and in choosing private firms to handle contracts for state services." California Senate Office of Research, The Status of Affirmative Action in California (1995), Pls. Exh. 5 at 2.

18. An analysis of the estimated effects of Proposition 209 on enrollments at just the U.C. Berkeley campus showed similar results. Specifically, it estimated that African American enrollment would drop from 222 (6.5%) in the 1995 class to 85–119 (2.5–3.5%) in the 1998 class, Latino enrollment would drop from 531 (15.6%) to 205–287 (6–8.4%); Native American enrollment would drop from 63 (1.8%) to 20–28 (6–8%), Asian American enrollment would increase from 1268 (37.2%) to 1516–1582 (44.5–46.4%), and White enrollment would increase from 1,018 (29.9%) to 1116–1164 (32.8–34.2%). Pls. Exh. 13.

dents, the applicant pool from these groups may fall as well, since high school students consider the probability of admission when deciding where to apply for college.

The record also suggests that, absent race- and gender-conscious admission programs, the admissions of African American, Latino, and American Indian students at California's public medical schools will significantly decrease. This in turn is likely to have a negative effect on the delivery of health care services in those communities. "On average, black physicians care for nearly six times as many black patients and Hispanic physicians care for nearly three times as many Hispanic patients as other physicians." Conrad Decl. ¶ 37; Drake Decl. ¶ 5.

### D. Impact of Proposition 209 on the Political Process

Prior to the passage of Proposition 209, anyone seeking to petition his or her government representatives to adopt, amend, or retain race- or gender-conscious affirmative action programs faced the same burdens as those faced by any constituent seeking preferential treatment for any group in the area of contracting, employment or education.[19] Typically, this burden involves directly petitioning and lobbying the specific representatives or policymakers with authority to adopt such programs. Such programs can generally be approved by simple majority vote or by executive decision. See e.g. Hernandez Decl. ¶ 5 (describing constituents' successful effort to convince city of San Francisco to adopt affirmative action program to remedy discriminatory practices in city contracting). In other cases, a local initiative process may be required.

After the passage of Proposition 209, women and minorities who wish to petition their government for race- or gender-conscious remedial programs face a considerably more daunting burden.[20] Before such persons can approach their school district, city council,

county government, or any other subdivision of government with such a proposal, they must first obtain an amendment to the California Constitution that would either (a) repeal Proposition 209, or (b) permit the specific government entity at issue to adopt a particular race- or gender-conscious affirmative action program.

The California Constitution can be amended through either an initiative constitutional amendment or a legislative constitutional amendment. Either method places a heavy burden on those seeking to advocate the use of constitutionally-permissible affirmative action programs in their local communities.

Under the first method—an initiative constitutional amendment—sponsors must first obtain signatures supporting the initiative equal to 8% of the previous gubernatorial vote. In 1996, this required the collection of 693,230 valid signatures. Cain Decl. ¶ 4. Since many signatures are disqualified, in order to ensure the requisite number of valid signatures, approximately 50% more "raw" signatures must be collected. Zimmerman Decl. ¶ 8. Because these signatures must be collected within a 150–day time limit, a campaign must typically collect up to 7,000 signatures during each of the 150 days. Id. ¶ 9. Given these requirements, and the size of California, hiring paid signature gatherers is a virtual necessity. The cost of obtaining signatures runs from $0.70 to $1.50 per signature. Id. ¶ 10. Thus, even where volunteers gather some portion of the required signatures, the cost of securing sufficient signatures, and minimally staffing a few offices, can run from $500,000 to $1.5 million. Id. ¶ 11; Cain Decl. ¶ 6. Once the initiative has qualified, it must gain majority approval by the voters.

Under the second method—legislative constitutional amendment—sponsors must secure a two-thirds vote of approval by both the California Senate and Assembly. A ma-

---

**19.** This would include, for example, constituents seeking preferential treatment for veterans or the disabled in employment, for local businesses in contracting, or for athletes, artists or California residents in admissions to public schools.

**20.** Defendants have not questioned the substantial evidence before the Court showing that women and minorities continue to face the effects of past and present discrimination and thus will continue to have an interest in using the political process to seek remedial action through affirmative action programs.

**Page 1499**

jority of the voters must then approve the amendment at the next statewide election.

In either case, substantial funds are required to organize and fund the statewide campaign that follows the initiative qualification procedure or requisite legislative approval. Again, the size of California makes this endeavor particularly expensive. To reach at least 10 million voters directly, a campaign would have to talk to 1,000 voters each day for 30 years. Zimmerman Decl. ¶ 12. Campaigns must thus generally reach voters through television, radio, print advertising, and direct mail. According to the California Commission on Campaign Financing, $109 million was spent on statewide initiatives on the 1990 ballot. Cain Decl. ¶ 6. The campaign in support of Proposition 209 had spent $3.1 million by October 1996. Cain Decl. ¶ 6.

As a result of the new political-process hurdles erected by Proposition 209, members of the plaintiff class are effectively precluded from petitioning local and state policymakers and representatives to adopt, maintain, or expand race- or gender-conscious affirmative action programs. For example, the Coalition for Economic Equity (Coalition), a named plaintiff in this action, has proposed fifteen amendments to the City of San Francisco's affirmative action policy. Members of the Coalition have met with City Supervisors in preparation for a vote on the proposed legislation by the entire San Francisco Board of Supervisors. The Coalition is now precluded from further pursuing this legislation through the normal political channels that were available prior to the adoption of Proposition 209.

## V. CONCLUSIONS OF LAW

### A. Likelihood of Success on Plaintiffs' Equal Protection Claim

"The Equal Protection Clause of the 14th Amendment guarantees racial minorities the right to full participation in the political life of the community." *Seattle,* 458 U.S. at 467, 102 S.Ct. at 3193. This guarantee applies with equal force to women. *United States v. Virginia,* —— U.S. at ——, 116 S.Ct. at 2275. The Equal Protection Clause not only prohibits the outright exclusion of women and minorities from the political process, but also prohibits more subtle distortions of the political process. *Seattle,* 458 U.S. at 467, 102 S.Ct. at 3193. In the words of the Supreme Court, "the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote." *Id.* at 476, 102 S.Ct. at 3198 (quoting *Hunter,* 393 U.S. at 393, 89 S.Ct. at 561–562).

Plaintiffs argue that Proposition 209, despite its facial neutrality, violates the Equal Protection Clause because it restructures the political process to disadvantage only those seeking to enact legislation intended to benefit minorities and women. Relying on the Supreme Court opinions in *Seattle* and *Hunter,* plaintiffs emphasize that prior to the enactment of Proposition 209, supporters of race- and gender-conscious affirmative action programs were able to petition their state and local officials directly for such programs. After the passage of Proposition 209, however, these same advocates face the considerably more daunting task of mounting a statewide campaign to amend the California Constitution. At the same time, those seeking preferences based on any ground other than race or gender, such as age, disability, or veteran status, continue to enjoy access to the political process at all levels of government. Plaintiffs thus maintain that Proposition 209 denies them the equal protection of the laws by removing the authority to redress racial and gender problems—and only those problems—to a new and remote level of government, thereby singling out the interests of minorities and women for a special political burden.

For the reasons noted earlier, the Court in testing Proposition 209 against the Equal Protection Clause focuses on a relatively narrow question: does Proposition 209's prohibition of constitutionally-permissible race- and gender-conscious affirmative action violate plaintiffs' right to equal protection of the laws?

### 1. Does the Seattle–Hunter Doctrine Apply?

Plaintiffs rely primarily on two Supreme Court cases, *Hunter* and *Seattle,*

to support their equal protection claim. "These cases yield a simple but central principle. . . . [T]he political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. [But] the State [may not] allocate governmental power nonneutrally by explicitly using the racial nature of a decision to determine the decisionmaking process." *Id.* at 470, 102 S.Ct. at 3195.

In *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the Supreme Court addressed the efforts of citizens of Akron, Ohio, to overturn duly-enacted legislation prohibiting racial discrimination in housing. After the city council adopted a fair housing law, the citizens by referendum amended the city charter to require that fair housing ordinances be put to a citywide vote before they could take effect. This requirement, set out in § 137 of the charter, not only affected future fair housing efforts, but also reached back to suspend the previously-enacted ordinance. *See id.* at 387, 89 S.Ct. at 558–559. The Supreme Court found that § 137 singled out local legislation of special interest to minorities for a unique political burden; while those seeking to enact ordinances regulating real estate on any basis other than race merely had to persuade the Akron City Council, "for those who sought protection against racial bias, the approval of the City Council was not enough." *Id.* at 390, 89 S.Ct. at 560. The Supreme Court ultimately concluded that Akron's restructuring of the political process violated the 14th Amendment.

The Supreme Court's analysis of § 137 turned on two particular features of the measure. First, § 137 raised equal protection concerns because it singled out an issue of particular interest to racial minorities—racial discrimination in housing. Had the measure imposed a new political burden on all legislation, the Supreme Court was quick to point out, it would not have run afoul of the 14th Amendment. *Id.* at 393–95, 89 S.Ct. at 561–563 (Harlan, J., concurring). Second, § 137 was suspect because it imposed a novel political burden on all future efforts to enact fair housing legislation. Had the citizens of Ak-

ron used the referendum process simply to repeal the fair housing ordinance previously adopted by the Akron City Council, this action alone would have raised no equal protection difficulty. *Id.* at 390 n. 5, 89 S.Ct. at 560 n. 5; *see also Crawford,* 458 U.S. at 539, 102 S.Ct. at 3218–19. Although neither of these two features of § 137, standing alone, would have offended the 14th Amendment, the Supreme Court held that the confluence of the two factors—the targeting of a racial issue and the reordering of the political process—constituted a racial classification that required the most exacting judicial scrutiny.

In *Washington v. Seattle School District No. 1,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the Supreme Court reaffirmed its ruling in *Hunter,* applying the rationale of that case to a statewide initiative designed to prohibit the mandatory busing of students to achieve racial integration in schools. After a Seattle school district took steps to establish a mandatory busing plan, the voters of Washington passed Initiative 350, which provided that "no school board . . . shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence." *Id.* at 462, 102 S.Ct. at 3190–3191. Three school districts that had previously initiated busing efforts challenged the initiative in court, and these challenges ultimately presented the Supreme Court with an "extraordinary question: whether an elected school board may use the Fourteenth Amendment to *defend* its program of busing for integration from attack by the State." *Id.* at 459, 102 S.Ct. at 3189 (emphasis in original).

Despite its facially neutral language, the Supreme Court found that Initiative 350 in reality barred only busing plans aimed at achieving racial integration while permitting busing for other purposes. In striking down the initiative, the Court found that it, like the enactment in *Hunter,* singled out an issue of concern to minorities—racial busing—and imposed special political burdens on those who supported the issue. These features of Initiative 350 led the Court to find that the facially-neutral measure was, in reality, a

racial classification subject to the most searching judicial scrutiny. *Id.* at 485, 102 S.Ct. at 3202–3203. In the words of the Court, "It is beyond dispute ... that the initiative was enacted 'because of,' not merely 'in spite of,' its adverse effects upon busing for integration." *Id.* at 471, 102 S.Ct. at 3195. As in *Hunter*, the Supreme Court concluded that, viewed in this light, Initiative 350 violated the 14th Amendment.

Before the Court applies these precedents to the case at bar, it notes that Proposition 209 shares several characteristics with the measures struck down in *Hunter* and *Seattle*. All three initiatives are facially neutral. All three grew from controversial efforts aimed at rolling back legislative gains that were intended as remedies for historical discrimination suffered by particular groups. Perhaps most importantly, in the wake of all three measures, those seeking to reenact such remedies could no longer use the same political mechanisms that had been available prior to the passage of the enactments.

As plaintiffs themselves concede, however, one difference between *Seattle* and *Hunter* and the matter at bar is readily apparent: *Seattle* and *Hunter* exclusively address racial issues,[21] whereas Proposition 209 addresses both race and gender preferences. Defendants urge this Court not to import the Supreme Court's *Seattle* and *Hunter* reasoning into the context of gender.

■ The Supreme Court "has repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship status." *United States v. Virginia*, —— U.S. at ——, 116 S.Ct. at 2275. Because "our Nation has had a long and unfortunate history of sex discrimination," equal protection jurisprudence requires that gender classifications must survive heightened judicial scrutiny. *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, ——, 114 S.Ct. 1419, 1425, 128 L.Ed.2d 89 (1994) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973)). Gender and racial classifications, however, do not receive identical treatment under the Equal Protection Clause; to date, the Supreme Court has reserved strict scrutiny for racial classifications. *United States v. Virginia*, —— U.S. at —— n. 6, 116 S.Ct. at 2275 n. 6. Gender classifications, meanwhile, are subject to less stringent intermediate scrutiny review. *Id.* at ——, 116 S.Ct. at 2274.

■ The differing levels of judicial scrutiny accorded race and gender classifications, however, do not render the reasoning of *Seattle* and *Hunter* inappropriate in the context of gender. On the contrary, the doctrinal approach of those cases is wholly consonant with the heightened scrutiny applicable to gender classifications. When a measure is challenged under the Equal Protection Clause, a court is required, as a threshold matter, to determine whether the challenged measure contains a race or gender classification. *See Adarand Constructors, Inc. v. Pena*, —— U.S. ——, ——, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (1995) (noting that presence of a race classification made the *Arlington Heights* intent analysis unnecessary); *Personnel Adm'r. of Mass. v. Feeney*, 442 U.S. 256, 273–74, 99 S.Ct. 2282, 2293–2294, 60 L.Ed.2d 870 (1979) (noting different equal protection analysis when no explicit gender classification is present). It is this threshold question that the *Seattle–Hunter* analysis is meant to answer. Only after concluding that a racial classification was involved did the Supreme Court in *Seattle* and *Hunter* proceed to subject the challenged enactments to strict scrutiny. *Seattle*, 458 U.S. at 485, 102 S.Ct. at 3202–3203; *Hunter*, 393 U.S. at 391–92, 89 S.Ct. at 560–561. In the gender context, similarly, a court should first apply the *Seattle–Hunter* analysis to determine whether a gender classification exists, and then apply the appropriate intermediate equal protection scrutiny. It is precisely by applying the *Seattle–Hunter* doctrine in cases involving gender that a court fulfills its obligation to scrutinize gender classifications carefully.

---

21. The referendum at issue in *Hunter* also burdened the interests of religious minorities, *see* 393 U.S. at 386, 89 S.Ct. at 558, but the Supreme Court's analysis of § 137 focused primarily on its racial component, *see id.* at 391, 89 S.Ct. at 560–561.

**1502**

Irrespective of the applicability of the rationale of *Seattle* and *Hunter* to gender, defendants maintain that the present case is not controlled by these precedents. Simply put, the defendants insist that because this case is different in kind from *Seattle* and *Hunter*, the *Seattle–Hunter* doctrine is wholly irrelevant.

First, defendants argue that Proposition 209, unlike the Washington and Akron initiatives, expressly *prohibits* classifications based on race and gender, and thus cannot be read to *create* such classifications. Defendants essentially ask this Court to read the plain language of Proposition 209, which concededly contains no classification on its face, and go no further. While it would certainly streamline the inquiry, this approach is expressly disapproved in *Hunter* and *Seattle*. Despite the facial neutrality of the challenged enactments in both of those cases, the Supreme Court looked beyond the plain language of the measure in question and inquired whether, "*in reality*, the burden imposed by [the] arrangement necessarily falls on the minority." *Seattle*, 458 U.S. at 468, 102 S.Ct. at 3194 (emphasis added, internal quotations omitted); *see also Hunter*, 393 U.S. at 391, 89 S.Ct. at 560–561.[22]

Defendants' argument, moreover, asks this Court to overlook the central purpose of the *Seattle–Hunter* doctrine: to determine whether facially neutral enactments in reality rest on "distinctions based on race" or gender. *Seattle*, 458 U.S. at 485, 102 S.Ct. at 3202–3203. Defendants cannot use Proposition 209's facial neutrality as a shield against the application of the *Seattle–Hunter* analysis; it is precisely the measure's facial neutrality that makes application of those cases appropriate. *Compare id.* (applying *Hunter* to find that a facially neutral measure operated as a racial classification) *with Crawford*, 458 U.S. at 539, 102 S.Ct. at 3218–3219 (applying the *Hunter* analysis to find that a facially neutral measure did not embody a racial classification). Defendants have simply mistaken the starting point of the equal protection analysis with its ending point.

Defendants next attempt to distinguish the *Seattle* and *Hunter* cases by shifting the focus of the inquiry from the initiatives themselves to the legislative efforts they effectively bar. From this standpoint, the defendants make two arguments that are variations on a single theme to distinguish *Seattle* and *Hunter* from the case at hand.

In the first argument, defendants contend that neither the mandatory busing programs barred by Initiative 350 nor the fair housing legislation barred by Akron's § 137 placed a burden upon the equal protection rights of nonminorities. Defendants insist that Proposition 209, in contrast, would outlaw preferences that by their very nature inflict injury on nonminorities. *See Adarand,* —— U.S. at ——, 115 S.Ct. at 2114 ("[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury . . . ."); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 280–83, 106 S.Ct. 1842, 1850–52, 90 L.Ed.2d 260 (1986) (opinion of Powell, J.) (discussing the burden placed on nonminorities by affirmative action programs aimed at remedying past discrimination). On this theory, Proposition 209 is distinguishable from the initiatives in *Seattle* and *Hunter* because it only interferes with "zero-sum" antidiscrimination efforts—those that help minorities, but do so at the expense of nonminorities.

The second argument focuses on the judicial scrutiny that attends the efforts banned by the challenged initiatives. According to defendants, the affirmative action efforts prohibited by Proposition 209 are, under existing 14th Amendment principles, themselves constitutionally suspect and subject to heightened scrutiny. *See Adarand,* —— U.S. at ——, 115 S.Ct. at 2117. The fair housing ordinance and the busing programs that were overturned by the initiatives in *Seattle* and *Hunter*, defendants argue, did not them-

---

**22.** Defendants' very argument, moreover, was before the Supreme Court in *Seattle*. As Justice Powell points out in his *Seattle* dissent, 458 U.S. at 491 n. 5, 102 S.Ct. at 3206 n. 5, Judge Wright, dissenting in the Ninth Circuit opinion in *Seattle*, concluded that "Initiative 350 does not treat persons differently on the basis of race." *Seattle Sch. Dist. No. 1 v. Washington,* 633 F.2d 1338, 1351 (9th Cir.1980) (Wright, J., dissenting). This conclusion did not win the approval of the Supreme Court, however, which affirmed the Ninth Circuit majority.

selves trigger heightened equal protection scrutiny.

Defendants' proposed distinctions, although not implausible on their face, both fail for the same reason: nothing in *Seattle* or *Hunter* suggests that the Supreme Court holdings turned on these features of the challenged amendments.[23] If the application of the *Seattle–Hunter* doctrine to Initiative 350 turned on whether or not Seattle's mandatory busing plan could be characterized as "zero-sum," as the defendants contend, the Supreme Court would presumably have addressed this difficult threshold issue. The opinion in *Seattle*, however, applied *Hunter* without examining whether mandatory busing presented a "zero-sum" scenario.[24] Similarly, the Supreme Court in *Seattle* expressly declined to reach the question of what level of equal protection scrutiny was applicable to Seattle's busing plan. *Seattle*, 458 U.S. at 472 n. 15, 102 S.Ct. at 3196. Consequently, defendants' contention that *Seattle's* holding turns on the scrutiny applicable to Seattle's busing program is unpersuasive.

Defendants' view of Initiative 350, moreover, overlooks the raging controversy that surrounded the issue of mandatory busing in 1978 and that constituted the backdrop for the Supreme Court's decision in *Seattle*. *See Seattle Sch. Dist. No. 1 v. Washington*, 473 F.Supp. 996, 1005–10 (W.D.Wash.1979), *aff'd*, 633 F.2d 1338 (9th Cir.1980), *aff'd*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (findings regarding the political controversy surrounding Seattle's busing efforts). It is evident that many who supported Initiative 350 felt that Seattle's busing plan benefited minority students at the expense of the majority. This is borne out by the fact that shortly after the implementation of the plan, four school board members who supported the plan narrowly avoided recall. *Seattle*,

458 U.S. at 460 n. 1, 102 S.Ct. at 3189 n. 1. As a result, defendants' conclusion that the busing plan in *Seattle* did not burden majority interests is, at best, both factually and legally ambiguous. *Id.* at 495 n. 9, 102 S.Ct. at 3208 n. 9 (Powell, J., dissenting) (suggesting that busing aimed at desegregation might, in fact, be viewed as burdensome to nonminority students).

Finally, defendants' focus on the particular legislation barred by Initiative 350, Akron's § 137, and Proposition 209, rather than on the initiatives themselves, suffers from a more fundamental flaw. Accepting defendants' arguments would essentially require that this Court read *Seattle* and *Hunter* as cases about the limits on state-sponsored remedies for past discrimination. This is the inevitable conclusion that emerges from a primary focus on the legislation blocked, rather than on the blocking initiative. As this Court has pointed out, however, the instant case, as well as *Seattle* and *Hunter*, are more appropriately understood as cases about access to the political process.

Because the *Seattle–Hunter* doctrine is designed to determine whether facially neutral enactments single out race and gender issues for unique political burdens, and thus are suspect classifications, defendants' efforts to distinguish *Seattle* and *Hunter* must fail. If, in reality, Proposition 209 does not single out a racial or gender issue for unfavorable treatment in the political process, the initiative will emerge from the *Seattle–Hunter* analysis unscathed. *See Crawford*, 458 U.S. at 539, 102 S.Ct. at 3218–19 (simple repeal of antidiscrimination law raises no equal protection concern). If, on the other hand, Proposition 209's facial neutrality masks a racial or gender classification, the Equal Protection Clause requires that the measure be subjected to heightened scrutiny. *See Seattle*, 458

---

**23.** The Court also notes that the defendants have not cited any authority addressing whether men suffer an equal protection injury of the sort set forth in *Adarand*, —— U.S. at ——, 115 S.Ct. at 2114, when a governmental body adopts a gender-conscious affirmative action program.

**24.** The Court also notes that the language of Proposition 209 itself undermines defendants' proposed "zero-sum" distinction. Defendants

urge that *Seattle* ought not apply where the challenged measure interferes only with "zero-sum" antidiscrimination efforts. By its terms, however, Proposition 209 prohibits *all* race and gender preferences, not merely those that operate in a "zero-sum" fashion. Consequently, Proposition 209's reach may extend beyond mere "zero-sum" antidiscrimination efforts. Put another way, Proposition 209 itself appears to be oblivious to the very distinction urged by defendants on its behalf.

**1504**

U.S. at 485, 102 S.Ct. at 3202–03. It is to this inquiry that this Court now turns.[25]

### 2. Application of the Seattle–Hunter Doctrine

 The *Seattle* opinion sets out the framework for analysis: if an "initiative removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests," it must be examined for equal protection purposes as if it were a racial classification. *Id.* Keeping the earlier discussion regarding the extension of this analysis to the gender context in mind, the Court applies the *Seattle* test to Proposition 209.

#### a. Racial Focus

 Just as the Supreme Court did in *Seattle*, this Court begins its analysis by asking whether Proposition 209, despite its facial neutrality, singles out an issue of special interest to minorities or women, and thus has a "racial [or gender] focus." *Id.* at 474, 102 S.Ct. at 3197.

In concluding that Initiative 350 had a racial focus, the Supreme Court relied in part on the perceptions of Washington voters. The Court found that despite Initiative 350's neutral language, proponents of the measure assured voters that it would affect only racial busing. *Id.* at 471, 102 S.Ct. at 3195–96. Given the nature of the political campaign that surrounded its passage and the measure's practical effect, the Supreme Court had no difficulty joining the District Court and Court of Appeals in concluding that Initiative 350 was "effectively drawn for racial purposes." *Id.*

The record likewise suggests that the campaign for Proposition 209 had a racial and gender focus. As described in the Findings of Fact, the independent LAO, as well as the supporters and opponents of Proposition 209,

characterized Proposition 209 as a referendum on race- and gender-conscious affirmative action. Named defendant Governor Pete Wilson himself signed the Argument in Favor statement, which opens with the following:

THE RIGHT THING TO DO!

A generation ago, we did it right. We passed civil rights laws to prohibit discrimination. But special interests hijacked the civil rights movement. Instead of equality, governments imposed quotas, preferences, and set-asides.

Pls. Exh. 2. Just as the voters of Washington perceived Initiative 350 as a referendum on busing, the evidence presently before the Court indicates that people of California viewed Proposition 209 as a referendum on affirmative action.

The Supreme Court, in evaluating whether Initiative 350 had a racial focus, also considered the enactment's practical effect. In *Seattle*, despite Initiative 350's non-racial language regulating student transportation, the practical effect of the measure was to prohibit only busing for racial integration, while leaving school districts free to employ busing for other purposes. *Seattle*, 458 U.S. at 474–75, 102 S.Ct. at 3197–98. Similarly, while Proposition 209's general language barring discrimination merely duplicates existing state and federal law, and thus does not materially alter existing state practices, Proposition 209's prohibition on preferences will have a practical effect on existing programs. The California Legislative Analyst, for example, concluded that Proposition 209's ban on race and gender preferences would eliminate existing state and local race- and gender-conscious affirmative action efforts in contracting, employment, and education. Pls. Exh. 2. The defendants, moreover, despite repeated questioning by plaintiffs and the Court, have not yet identified a single existing program, other than race- and gen-

---

25. Counsel for defendants at oral argument suggested that, to the extent the present Supreme Court might not embrace the rationale of *Seattle* and *Hunter*, this Court is not bound by those opinions. The Court does not so interpret the law, and thus declines to adopt defendants' argument. It is not for this Court to decide whether

the Supreme Court might overturn its previous rulings. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989) (lower court must follow Supreme Court precedent until it is overturned).

der-conscious affirmative action programs, that would be affected by Proposition 209.[26]

While all parties concede that Proposition 209, at the very least, will prohibit race- and gender-conscious affirmative action efforts, it is equally plain that preferences unrelated to race and gender remain unaffected by Proposition 209. The University of California, for example, remains free after Proposition 209 to continue its practice of considering in its admissions decisions "California residence ..., physical and learning disabilities, educational disadvantage, family income, and whether a student comes from a two-parent or single-parent family, is first-generation college bound or has special talents (for example, artistic or athletic ability) or experiences," Young Decl. ¶ 13. Thus, the primary practical effect of Proposition 209 is to eliminate existing governmental race- and gender-conscious affirmative action programs in contracting, education, and employment and prohibit their creation in the future, while leaving governmental entities free to employ preferences based on any criteria other than race or gender.

The opinion in *Seattle*, after concluding that the practical effect of Initiative 350 was to prohibit racial busing, addressed whether racial busing was an issue of special interest to minorities. Satisfied that Proposition 209 singles out race- and gender-conscious affirmative action, the Court turns to a similar question: is affirmative action an issue of special interest to minorities and women? The Court finds that the record fully supports plaintiffs' contention that state-sponsored race- and gender-conscious affirmative action "inures primarily to the benefit of the minority, and is designed for that purpose." *Seattle,* 458 U.S. at 472, 102 S.Ct. at 3196. As discussed in the Findings of Fact, plaintiffs have produced extensive evidence documenting the dramatic effect that affirmative action has had on the opportunities available to minorities and women in public contracting, employment, and education.

Defendant-intervenor CADP stresses that, in recent years, the effectiveness and wisdom of race- and gender-conscious affirmative action programs have been called into question. In particular, CADP notes that as California becomes increasingly heterogeneous, affirmative action programs designed to benefit one racial minority can actually harm the interests of another racial minority. This insight, however, has no bearing on the "racial focus" inquiry mandated by *Seattle.* The fact that African Americans and whites could be found on both sides of the busing debate in that case did not prevent the Supreme Court from concluding that Initiative 350 addressed a racial issue. *Id.* at 472, 102 S.Ct. at 3196 (noting that "Negroes and whites may be counted among both the supporters and the opponents of Initiative 350").

■ In any event, the "racial focus" inquiry set down in *Seattle* does not depend on the wisdom or efficacy of any particular affirmative action program. "In the absence of a constitutional violation, the desirability and efficacy" of race- and gender-conscious affirmative action "are matters to be resolved through the political process." *Id.* at 474, 102 S.Ct. at 3197. Rather, the question posed by *Seattle* is whether the issue in question is generally perceived as one of special interest to minorities and women, and if the issue has been singled out for unfavorable political treatment. As the Supreme Court held in *Seattle,* an enactment is unconstitutional if it "removes the authority to address *a racial problem*—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests." *Id.* (emphasis added). This Court has no trouble concluding that affirmative action is appropriately understood as "racial problem" and, similarly, a "gender problem" in the sense meant by the Supreme Court. *Id.* ("For present purposes, it is enough that minorities may consider busing for integration to be legislation that is in their interest.")

---

**26.** Counsel for defendant-intervenor CADP suggested at oral argument that there may be municipal programs granting preferences to certain ethnic groups that might be barred by Proposition 209. Aside from counsel's oral representa-

tion, however, the Court has nothing on the record from which to conclude that Proposition 209 has a substantial impact beyond the race- and gender-conscious affirmative action context.

For the foregoing reasons, the Court is satisfied that plaintiffs have demonstrated that Proposition 209 "was enacted 'because of,' not merely 'in spite of,' its adverse effects upon" affirmative action, and thus that the measure was effectively drawn for racial purposes.[27] *Id.* at 471, 102 S.Ct. at 3195–96.

### b. Restructuring the Political Process

The Court next must ask whether Proposition 209 restructures the political process to the detriment of the interests of minorities and women.

The Supreme Court in *Seattle* addressed this issue by comparing the political burden faced by those seeking race-based busing with the burden faced by those seeking student assignment policies for nonracial reasons. Prior to the passage of Initiative 350, the state left virtually all matters of education policy, including busing to achieve integration, to local school boards. *Id.* at 477–82, 102 S.Ct. at 3198–3201. The Court found that, after Initiative 350, "[t]hose favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate." *Id.* at 474, 102 S.Ct. at 3197. Those interested in busing for other purposes, in contrast, could continue to petition their local school boards for such programs. The Court concluded that this restructuring of political authority imposed a "comparative burden ... on minority participation in the political process." *Id.* at 480 n. 23, 102 S.Ct. at 3200 n. 23.

In evaluating Proposition 209, this Court employs the same comparative approach utilized in *Seattle.* The defendants here concede that prior to Proposition 209, those seeking preferences—whether based on race, gender, disability, veteran status, economic disadvantage, age, residency, or any other basis—in public contracting, employment, and education could directly petition their state and local governmental entities for such preferential treatment. After the enactment of Proposition 209, those seeking race- and gender-conscious affirmative action must first mount a statewide campaign to amend the state constitution, while those seeking preferential treatment on all other grounds need not surmount any new political hurdle.

The record compiled by plaintiffs indicates that this changed political landscape imposes a substantial burden on the interests of women and minorities. The Coalition, for example, has been instrumental in persuading the City and County of San Francisco ("San Francisco") to adopt contracting ordinances that include race- and gender-conscious provisions designed to remedy the city's history of discrimination in contracting ("MWBE Ordinance").[28] Since the adoption of the MWBE Ordinance, the Coalition has continued to support the program, periodically proposing modifications designed to enhance its effectiveness and ensure its conformity with federal and state law.[29]

After Proposition 209, the doors of San Francisco government are closed to groups like the Coalition. The Coalition thus faces

---

27. In so finding, the Court does not pass on whether any discriminatory intent lay behind the adoption of Proposition 209. The Supreme Court in *Seattle* made it plain that such an inquiry is not required under the *Seattle–Hunter* analysis. 458 U.S. at 484–86, 102 S.Ct. at 3202–03. The Court nevertheless notes that the Supreme Court in *Seattle* also suggested that any measure that ran afoul of the *Seattle–Hunter* analysis "inevitably raises dangers of impermissible motivation." *Id.* at 486 n. 30, 102 S.Ct. at 3203 n. 30.

28. The MWBE Ordinance is codified at San Francisco Administrative Code § 12D and has been the subject of extensive litigation in this Court. *See, e.g., F.W. Spencer & Son, Inc. v. City and County of San Francisco,* C 95–4242 TEH; *Associated Gen. Contractors v. City and County of San Francisco,* 748 F.Supp. 1443 (N.D.Cal.1990),

*aff'd,* 950 F.2d 1401 (9th Cir.1991), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

29. As CADP notes, the Equal Protection Clause itself imposes a considerable burden on governmental entities seeking to adopt race- and gender-conscious affirmative action programs, and thus indirectly places a considerable burden on organizations like the Coalition that lobby for such programs. *See Associated Gen. Contractors,* 950 F.2d at 1413–18 (after examining San Francisco's MWBE Ordinance using exacting equal protection scrutiny, holding that the ordinance does not offend the 14th Amendment). What the Equal Protection Clause does not do, however, is force organizations like the Coalition to take their petition to "a new and remote" level of government, as does Proposition 209.

not only the prospect that San Francisco's MBWE Ordinance might fall to a court challenge brought under Proposition 209,[30] but also must embark on a statewide campaign to repeal or amend Proposition 209 if they are to enact any similar legislation in the future. As detailed in the Findings of Fact, the evidence before the Court indicates that this additional political hurdle is a high one: the Coalition would need to collect approximately 700,000 valid signatures to qualify an initiative, and then would have to mount an expensive statewide media campaign to persuade voters to vote in its favor at the polls. This political burden stands in stark contrast to the local effort the Coalition faced prior to the passage of Proposition 209.

The example of San Francisco's MWBE Ordinance also demonstrates that Proposition 209, like Initiative 350, burdens minority interests by indiscriminately eliminating even programs that do not arouse popular opposition. Despite Proposition 209's statewide victory, the voters of San Francisco opposed the measure by a margin of 70.5% to 29.4%.[31] In the words of the Supreme Court,

> In such situations the initiative makes the enactment of racially beneficial legislation difficult, though the particular program involved might not have inspired opposition had it been promulgated through the usual legislative processes used for comparable legislation. This imposes direct and undeniable burdens on minority interests.

*Seattle,* 458 U.S. at 483–84, 102 S.Ct. at 3202 (internal footnote omitted); *see also Hunter,* 393 U.S. at 395–96, 89 S.Ct. at 562–63 (noting that § 137 has its real impact only where fair housing ordinances do *not* arouse opposition, because truly controversial measures would presumably be repealed via the existing referendum procedure).

In response to plaintiffs' showing regarding political burden, defendants insist that Proposition 209 in no way reorders the political process with respect to race and gender preferences. In their view, the proper forum

for addressing fundamental issues regarding individual rights has always been the state constitution, and Proposition 209 merely modifies the existing constitutional guarantee of equal treatment at the appropriate governmental level.

This argument has substantial merit with respect to Proposition 209's broad antidiscrimination provision—the general ban on invidious race and gender discrimination is certainly a matter of constitutional decisionmaking. As the Court has pointed out, however, it is Proposition 209's ban on preferences, not its general ban on discrimination, that is the focus of the instant suit. In this narrower context, defendants' argument falls short. Prior to the passage of Proposition 209, the discretion to adopt constitutionally-permissible race- and gender-conscious affirmative action programs was, as defendants' counsel conceded at oral argument, lodged with state and local government entities, not reserved at the constitutional level.

Moreover, the Supreme Court explicitly rejected defendants' argument in *Seattle.* In that case, Washington argued that it exercised plenary power over matters concerning public education, and that Initiative 350's ban on racial busing should thus be understood as change in policy by the body ordinarily charged with policymaking discretion. *Seattle,* 458 U.S. at 475–76, 102 S.Ct. at 3198. In rejecting this view, the Supreme Court emphasized that the issue was not whether the state had the power to ban race-based busing, but rather whether it had "exercised its power in such a way as to place special, and therefore impermissible, burdens on minority interests." *Id.* at 476 n. 18, 102 S.Ct. at 3198 n. 18. Similarly, in the instant case no one challenges California's power to modify its basic constitutional guarantees of individual rights. The "single narrow question" before this Court is whether the state has exercised that power in a manner that violates the 14th Amendment. *Id.*

---

**30.** San Francisco admits that legal challenges to its MWBE Ordinance based on Proposition 209 are imminent. The Court expresses no opinion on the merits of such a claim, should it ultimately be pressed by a party to this or any other suit.

**31.** The Court takes judicial notice of these figures. *See* San Francisco Elections Commission election summary, available at http://www.ci.sf.ca.us/election/update.htm.

The foregoing discussion also addresses defendants' contention that the present case is controlled by the Supreme Court's decision in *Crawford v. Board of Education*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), which was handed down on the same day as *Seattle*. That case involved a California constitutional amendment, Proposition 1, that the voters enacted in 1979. Proposition 1 aligned the authority of state courts to that of the federal courts with respect to court-ordered racial busing. In reviewing this initiative, the Supreme Court held that it merely repealed the prior constitutional language that had been interpreted to grant state courts more flexibility in ordering busing than was possessed by federal courts. *Id.* at 539, 102 S.Ct. at 3218-19. The Supreme Court further found that the repeal did not distort the political process—in the Supreme Court's view, what the people of California gave via the constitution, they chose to repeal via the same mechanism. *Id.* at 541, 102 S.Ct. at 3219-20; *id.* at 547, 102 S.Ct. at 3222-23 (Blackmun, J., concurring). Local school boards, which had been free to adopt certain busing programs aimed at desegregation, remained free after Proposition 1 to adopt such programs.[32] *Id.* at 535-536, 102 S.Ct. at 3216-17 (noting that this feature of Proposition 1 distinguished it from the initiative in *Seattle* ).

As should be clear from the earlier discussion, the present case is dramatically different from *Crawford*. First, Proposition 209 cannot be characterized as a mere repeal. Proposition 209, by its terms, not only repeals all existing state and local affirmative action programs, but also prohibits the adop-

tion of such programs in the future. In so doing, Proposition 209 displaces authority with respect to a race and gender issue to "a new and remote level of government," *Seattle*, 458 U.S. at 483, 102 S.Ct. at 3202, and thus reorders the political process to the detriment of women and minorities. Hence, rather than supporting defendants' position, *Crawford* underscores the troubling features of Proposition 209.

Because the Court finds, based on the foregoing, that Proposition 209 singles out an issue of special concern to minorities and women—race- and gender-conscious affirmative action—and alters the political process solely with respect to this issue, it concludes that the initiative "plainly rests on distinctions based on race." *Id.* at 485, 102 S.Ct. at 3203 (internal quotes omitted).

### c. Heightened Scrutiny

Where a governmental enactment rests on a racial or gender classification, a court must expose it to "a most searching examination." *Adarand*, —— U.S. at ——, 115 S.Ct. at 2111 (quoting *Wygant*, 476 U.S. at 273, 106 S.Ct. at 1846-47 (opinion of Powell, J.)). In examining race and gender classifications, however, the Supreme Court has employed two different standards, reserving the most exacting judicial scrutiny for situations involving race.[33] *United States v. Virginia*, —— U.S. at —— n. 6, 116 S.Ct. at 2275 n. 6. Because this Court finds that Proposition 209 fails to survive the lesser scrutiny due its inherent gender classification, it need not apply the more stringent strict scrutiny test.[34]

---

**32.** A number of such voluntarily adopted desegregation programs, in fact, may well be threatened by Proposition 209. *See* Pls.Exh. 8 (Los Angeles Unified School District, Fingertip Facts: Student Integration Services, 1995-96, Reference Guide No. 10 (Rev.)).

**33.** The Supreme Court has never squarely decided whether classifications based on gender are inherently suspect and thus deserving of strict scrutiny review. The rule drawn from the cases is that gender classifications must survive *at least* intermediate scrutiny. *See United States v. Virginia*, —— U.S. ——, ——, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996) (gender classifications must clear "at least" intermediate scrutiny); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, ——

n. 6, 114 S.Ct. 1419, 1425 n. 6, 128 L.Ed.2d 89 (1994) (Court "need not decide whether classifications based on gender are inherently suspect"); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 26, 114 S.Ct. 367, 373, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring) (noting that "it remains an open question whether classifications based on gender are inherently suspect") (citations and internal quotes omitted). Because Proposition 209 fails to survive intermediate scrutiny, this Court need not decide whether gender classifications are inherently suspect.

**34.** Other courts have suggested that *Seattle* and *Hunter* can be explained as cases involving the fundamental right of all citizens to participate equally in the political process. *See, e.g., Evans*

■ In applying the intermediate scrutiny test appropriate to gender classifications, the Court is mindful of the Supreme Court's recent cases in this area. *See United States v. Virginia, supra; J.E.B. v. Alabama ex rel. T.B., supra.* According to the Supreme Court, "Today's skeptical scrutiny of official action denying rights or opportunities based on sex responds to volumes of history." *United States v. Virginia,* —— U.S. at ——, 116 S.Ct. at 2274. In order to survive this scrutiny, a gender classification must be supported by an "exceedingly persuasive justification." *Id.* at ——, 116 S.Ct. at 2275. The state has the burden of showing that the challenged classification "serves important governmental objectives" and that the means employed are "substantially related to the achievement of those objectives." *Id.*

■ In applying this demanding test, the Court asks a simple question: what important governmental interest is served by reordering the political process to the detriment of women's interests? With respect to this question, the defendants have not shouldered their burden. Defendants first suggest that Proposition 209 serves the important state interest of ending discrimination on the basis of race and gender. While undoubtedly important, however, this state interest is a non-sequitor with respect to Proposition 209. The Court fails to see how this purported interest is related to, much less justifies, the nonneutral reordering of the political process that is at issue in this case. As *Seattle* and *Hunter* make clear, it is *not* Proposition 209's prohibition on affirmative action that raises equal protection concerns; rather, it is the reordering of the political process that triggers exacting judicial scrutiny. Defendants have not identified any feature of the prior political process that was discriminatory, and thus their invocation of a state interest in eliminating discrimination cannot justify the nonneutral reordering of that process.

The defendants also suggest that Proposition 209 serves an important state interest in avoiding liability under the 14th Amendment for affirmative action programs that have not yet been tested in court. As an initial matter, the Court notes that defendants have cited no cases suggesting that a state's abundance of caution can, by itself, constitute an important interest that would justify a gender classification. Even assuming that such an interest could justify a gender classification, Proposition 209 is a hopelessly overbroad means to that end. Proposition 209, far from being limited to affirmative action programs implemented by state agencies that have not been tested in court, prohibits all preferences, whether at the state or municipal level, and whether tested or untested in court.

### 3. Conclusion

The Court turns finally to defendants' *reductio ad absurdum* attack on the plaintiffs' equal protection argument. Defendants submit that the *Seattle* and *Hunter* cases cannot be read to invalidate Proposition 209, because such a reading would necessarily lead to an absurd reordering of the relationship between states and subordinate local government units. According to this argument, if the Court accepts plaintiffs' position, such a holding would, in effect, permit local governmental bodies to preempt state authority on any racial or gender issue, at least where the local entity has acted to confer a benefit on minorities or women.

In making this argument, defendants rely primarily on concerns expressed by Justice Powell in his dissenting opinion in *Seattle,* 458 U.S. at 494–95, 498 n. 14, 102 S.Ct. at 3207–08, 3210 n. 14. As the majority in that case pointed out, however, the difficult dilemma posed by Justice Powell was not presented by Initiative 350. *Id.* at 480 n. 23, 102 S.Ct. at 3200 n. 23. Similarly, the dilemma posed by defendants does not follow from plaintiffs' equal protection claim in the instant case. Nothing about plaintiffs' argu-

---

*v. Romer,* 854 P.2d 1270, 1279–82 (Colo.1993), *aff'd on other grounds,* —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). On this theory, any law that infringed this fundamental right would be subject to strict scrutiny, regardless of the race or gender focus of the enactment. This

Court's application of intermediate scrutiny to the gender classification inherent in Proposition 209 is not meant as a rejection of the fundamental rights approach. Rather, because the parties have not argued this issue, the Court expressly declines to pass on the merits of this theory.

ment requires that the state of California be forever barred from addressing a race- or gender-conscious affirmative action program where a local authority has acted first. The *Seattle–Hunter* doctrine merely regulates the *manner* of any state intervention, preventing the state from nonneutrally reordering the political process to burden the interests of minorities or women. A state, for example, remains free to restructure the political process in a neutral manner, even where such a change indirectly burdens the political participation of women and minorities. A state may also intercede where it can articulate a justification that survives equal protection scrutiny. What a state may not do, according to the *Seattle–Hunter* doctrine, is single out an issue of special interest to minorities and women and require that such legislation run a unique political gauntlet.

Plaintiffs' argument does not require that, once supporters of race- and gender-conscious affirmative action have suceeded at the ballot box, their victory can never be undone. Nothing in the Constitution requires that the political system guarantee victory to those who support affirmative action. The body that enacts an affirmative action measure is free, of course, to repeal it.[35] *See Crawford,* 458 U.S. at 539, 102 S.Ct. at 3218–19. In short, those who support race- and gender-conscious affirmative action must compete within the neutral rules of the political process—the 14th Amendment expects that in the democratic struggle, the interests of minorities and women will sometimes prevail, and will sometimes be defeated. *See Hunter,* 393 U.S. at 394, 89 S.Ct. at 562 (Harlan, J., concurring) (noting that neutral rules structuring the political process "will sometimes operate in favor of one faction; sometimes in favor of another").

Once those who support race- and gender-conscious affirmative action prevail at one level of government, however, the Equal Protection Clause will not tolerate an effort by the vanquished parties to alter the rules of the game—solely with respect to this single issue—so as to secure a reversal of fortunes. Plaintiffs have borne their burden of showing that Proposition 209, by removing authority over race- and gender-conscious affirmative action to "a new and remote" level of government, has precisely such an effect. Such a reordering of the political process is tantamount to vote dilution in the most literal sense: the relevant voting pool is effectively expanded until the prior victory is undone. *Cf. Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (holding that a state may not impair the voting rights of minorities under the guise of reapportionment). Where such a political restructuring is aimed at a subject of particular interest to minorities and women, it is particularly problematic, and the Equal Protection Clause demands that it be subjected to heightened judicial scrutiny. "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection in the most literal sense." *Romer v. Evans,* — U.S. ——, ——, 116 S.Ct. 1620, 1628, 134 L.Ed.2d 855 (1996).

For the reasons set forth above, the Court finds that plaintiffs have demonstrated a probability of success on the merits of their equal protection claim.

## B. Likelihood of Success on Plaintiffs' Preemption Claims

### 1. Introduction

Plaintiffs assert that Proposition 209 violates the Supremacy Clause of the United States Constitution by proscribing governmental entities from voluntarily employing race- and gender-conscious affirmative action as a remedy for the effects of past and present discrimination. Plaintiffs base their contention on the hypothesis that Congress intended to preserve voluntary affirmative action as a means to attain the goals embodied in three federal civil rights acts—Titles

---

**35.** The University of California, for example, has acted on its own accord to discontinue the use of race and gender preferences in admissions, contracting, and employment decisions. Pls. Exh. 11 (discussing Regents Resolutions SP–1 and SP–2). Governor Wilson has also issued an executive order repealing race- and gender-conscious affirmative action programs under his immediate control. Defendants' Request for Judicial Notice, Exh. 2 (Executive Order W–124–95, June 1, 1995).

VI and VII of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972.[36] By outlawing race- and gender-conscious affirmative action, plaintiffs argue, Proposition 209 conflicts and interferes with the objectives of the three federal civil rights acts. Consequently, plaintiffs conclude that Proposition 209 must be invalidated by the Supremacy Clause of the United States Constitution.

■■■ Article VI of the United States Constitution states, in part, "[t]his Constitution and the Laws of the United States ... shall be the supreme Law of the Land." In general, preemption is not to be lightly presumed under the Supremacy Clause. *California Federal Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 281, 107 S.Ct. 683, 689–90, 93 L.Ed.2d 613 (1987). Nevertheless, the Supremacy Clause has been interpreted to require preemption of state laws in certain circumstances.[37] The Supreme Court has enunciated two basic doctrines of preemption: conflict preemption and field preemption.

### 2. Preemption of State Law by Title VII

#### a. Field Preemption

■■■ Plaintiffs raise no field preemption claim and Congress plainly did not intend to "fill the field" of employment antidiscrimination law when it enacted Title VII. 42 U.S.C. § 2000h–4 ("Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of state laws on the same subject matter ..."); *See Guerra*, 479 U.S. at 282, 107 S.Ct. at 690.[38]

#### b. Conflict Preemption

■■■ Conflict preemption bars the application of any state law that contravenes federal law. This type of preemption occurs when an individual or entity cannot simultaneously conform to state and federal law. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248 (1963). When compliance with both federal and state law is impossible the state law must relent. *California v. ARC America Corp.*, 490 U.S. 93, 100, 109 S.Ct. 1661, 1664–65, 104 L.Ed.2d 86 (1989) (quoting *Florida Lime*, 373 U.S. at 142–143, 83 S.Ct. at 1217–1218).

■■■ State law is also preempted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 107 S.Ct. 805, 811, 93 L.Ed.2d 883 (1987) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). As under other forms of preemption, the ultimate touchstone of an obstacle preemption analysis is the Congressional purpose embodied in the federal legislation. *Wisconsin Dept. of Industry, Labor and Human Rela-*

36. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d *et seq.*

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C. § 2000e *et seq.*

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance. 20 U.S.C. § 1681.

37. Here, the state law being challenged under the Supremacy Clause is an amendment to the California Constitution, the most puissant of state laws; that fact however is irrelevant in a preemption analysis. Under the Supremacy Clause, "[t]he relative importance to the State of its own law is not material when there is a conflict with federal law .... [a]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Free v. Bland*, 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962).

38. The doctrine of field preemption commands that a state law yield when it operates in an area where the " 'scheme of federal regulation ... [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' " *English v. General Electric Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

*tions v. Gould, Inc.*, 475 U.S. 282, 290, 106 S.Ct. 1057, 1063, 89 L.Ed.2d 223 (1986). Obstacle preemption, however, further requires a court to examine the methods Congress has chosen to achieve its purposes. To the extent a state law interferes with the manner in which Congress intended the federal law to operate, the state law is preempted—even where the state and federal laws share common goals. *Gade v. National Solid Wastes Management Ass'n.*, 505 U.S. 88, 103, 112 S.Ct. 2374, 2385–86, 120 L.Ed.2d 73 (1992).[39]

### i. Actual Conflict Preemption

■ Plaintiffs contend that Proposition 209 is in actual conflict with Title VII. *See Florida Lime*, 373 U.S. at 142–143, 83 S.Ct. at 1217–1218. To establish that an entity cannot simultaneously comply with both Title VII and Proposition 209, a plaintiff must demonstrate that some action required by Title VII simultaneously violates Proposition 209. Plaintiffs argue that, at times, voluntarily-adopted race- or gender-conscious remedies are the *sole* means of compliance with Title VII, and therefore Proposition 209 must be preempted under *Florida Lime*.

Plaintiffs sole citation regarding this supposition is the First Circuit's review of the Boston Police Department's consent decree under the standard enunciated in *Croson. Stuart v. Roache*, 951 F.2d 446 (1st Cir.1991). While *Stuart* presents a factual predicate that likely could have served as the basis for a successful Title VII action, it is by no means obvious that the development of an affirmative action plan was the *only* alternative available that would have allowed the police department to avoid liability. *Cf.* 42 U.S.C. 2000e–2(j).

Plaintiffs further argue that Proposition 209 is in actual conflict with Title VII because that an entity might not be able to comply simultaneously with Proposition 209 and a court order pursuant to Title VII that mandates a race- or gender-conscious remedy.[40] Plaintiffs have not demonstrated that the "actual conflict" preemption doctrine of *Florida Lime* applies with equal force when an entity cannot concurrently obey the dictates of state law and a court order pursuant to a federal law.[41]

**39.** The Court notes that many of the cases employing obstacle preemption involve federal laws in areas where Congress has so fully regulated that the courts could nearly conclude that Congress left no room for states to legislate. *See, e.g., Gade*, 505 U.S. at 104, n. 2, 112 S.Ct. at 2386, n. 2 ("Although we have chosen to use the term 'conflict' preemption, we could as easily have stated that the promulgation of a federal safety and health standard 'pre-empts the field ...'"); *Hines*, 312 U.S. at 66, 61 S.Ct. at 404 ("[F]ederal government, in the exercise of its superior authority in [the field of regulation of aliens] has enacted a complete scheme of regulation ..."); *Gould*, 475 U.S. at 286, 106 S.Ct. at 1061 ("It is now commonplace that in passing the NLRA Congress largely displaced state regulation of industrial relations.").

It is apparent, however, that the application of obstacle preemption is not limited to circumstances where Congress has nearly filled the field. The Supreme Court has employed this form of preemption in fields where states are explicitly permitted to legislate. *See, e.g., Michigan Canners and Freezers Ass'n., Inc. v. Agricultural Marketing and Bargaining Bd.*, 467 U.S. 461, 469, 104 S.Ct. 2518, 2522–23, 81 L.Ed.2d 399 (1984) (Michigan Agricultural Marketing and Bargaining Act preempted by Agricultural Fair Practices Act (AFPA), despite the fact that AFPA reflects no congressional intent to occupy the field); *Felder v. Casey*, 487 U.S. 131, 108 S.Ct.

2302, 101 L.Ed.2d 123 (1988) (Wisconsin notice-of-claim statute interferes with the purpose of Congress in enacting § 1983); *Lawrence County v. Lead–Deadwood School Dist.*, 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985) (Payment in Lieu of Taxes Act preempts South Dakota statute which obstructs congressional purpose).

**40.** Subdivision (d) of Proposition 209 permits race- and gender-conscious affirmative action pursuant to court orders and consent decrees predating the enactment of Proposition 209, but makes no exception for orders or consent decrees entered after the Proposition 209 effective date. CAL. CONST. art. 1, § 31(d) ("Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.").

**41.** The Court's preliminary investigation of actual conflict preemption cases only reveals factual circumstances where an entity was trapped between a state and a federal law. No cases discussed the application of actual conflict preemption where an entity was unable to comply simultaneously with a state law and a remedy imposed by a court pursuant to a federal law. *See, e.g., Hook v. State of Ariz.*, 907 F.Supp. 1326, 1340–41 (D.Ariz.1995) (Court rejects defendants' defense that it was "legally impossible" to comply with federal court orders and an Arizona statute).

For the foregoing reasons the Court finds that plaintiffs have not demonstrated a likelihood of success on the merits of their claim that Proposition 209 actually conflicts with Title VII.

### ii. Obstacle Preemption

■ Plaintiffs further urge this Court to find that Proposition 209 runs afoul of the obstacle preemption doctrine because it interferes with the congressional purposes embodied in Title VII. Before this Court can find that Proposition 209 "stands as an obstacle" to the fulfillment of Congressional purposes, it must determine that one of those purposes was to preserve voluntary race- and gender-conscious affirmative action as an option for employers under Title VII. Merely showing that such affirmative action is *permissible* under Title VII is insufficient to support a finding of preemption. If Congress did not intend to preserve voluntary affirmative action as an option, and if such affirmative action is simply one of several equally effective means available to reach the goals of Title VII, banning voluntary affirmative action would not impede the realization of Congress' purpose.

While plaintiffs must demonstrate more than the *permissibility* of voluntary race- and gender-conscious affirmative action, they need not, as defendants suggest, show that affirmative action is *mandated* by Title VII. Rather, demonstrating either that (1) the discretion to utilize voluntary affirmative action is necessary to achieve the objectives of Congress or (2) such affirmative action is a method Congress intended to preserve under Title VII is sufficient to establish that the prohibition of affirmative action would interfere with Congressional intent.

■ The primary source of Congressional intent is the plain language of the statute.

Unfortunately, the statutory language of Title VII fails to address whether Congress intended to preserve the option of utilizing voluntary race- and gender-conscious affirmative action. The sole reference to race- and gender-based preferences in Title VII simply indicates that Title VII should not be construed to *require* the adoption of preferences. 42 U.S.C. § 2000e-2(j) ("Nothing contained in this subchapter shall be interpreted to require any [entity] ... subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group ...").[42]

Because Title VII is silent on the issue of Congress' intent regarding the role of voluntary race- and gender-conscious affirmative action under the Title VII schema, this Court must turn to the Equal Employment Opportunity Commission's ("EEOC") interpretation of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984) ("If ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute ... the question for the court is whether the agency's answer is based on a permissible construction of the statute.").

The EEOC Guideline explaining the role of voluntary affirmative action under Title VII states: "Voluntary affirmative action to improve opportunities for minorities and women must be encouraged and protected in order to carry out the Congressional intent embodied in title VII." 29 C.F.R. § 1608.1(c). The EEOC guideline recognizes

---

**42.** The Supreme Court's consideration of Congress' intent regarding affirmative action under Title VII has been limited to determining whether affirmative action is, at times, required under the statute and whether Title VII permits affirmative action. *See, e.g., Johnson v. Transportation Agency, Santa Clara County, Cal.,* 480 U.S. 616, 644, 107 S.Ct. 1442, 1458, 94 L.Ed.2d 615 (1987) (Stevens, J., concurring) ("It remains clear that the Act does not *require* any employer to grant preferential treatment....") (emphasis in original); *United Steelworkers of America,* *AFL–CIO–CLC v. Weber,* 443 U.S. 193, 208, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979) ("We therefore hold that Title VII's prohibition ... against racial discrimination does not condemn all private, voluntary affirmative action programs."); *Local 28 of Sheet Metal Workers' Intern. Ass'n v. E.E.O.C.,* 478 U.S. 421, 464, 106 S.Ct. 3019, 3044, 92 L.Ed.2d 344 (1986) ("Our examination of the legislative policy behind Title VII leads us to conclude that Congress did not intend to prohibit a court from [ordering affirmative action in appropriate circumstances] ...").

that Congress intended, as one of its central objectives, to encourage voluntary compliance with the statute. "The principle of nondiscrimination in employment ... and the principle that each person subject to Title VII should take voluntary action to correct the effects of past discrimination ... without awaiting litigation, are mutually consistent and interdependent methods of addressing social and economic conditions which precipitated the enactment of Title VII." *Id.* The EEOC has thus concluded that permitting voluntary affirmative action is crucial if entities are to comply voluntarily with Title VII: "The importance of voluntary affirmative action on the part of employers is underscored by Title VII of the Civil Rights Act of 1964, Executive Order 11246, and related laws and regulations—all of which emphasize voluntary action to achieve equal employment opportunity." 29 C.F.R. § 1607.17(1).

The EEOC guidelines, which were developed to clarify "uncertainty as to the meaning and application of Title VII, [which could] threaten the accomplishment of the clear Congressional intent to encourage affirmative action," 29 C.F.R. 1608.1(a), reveal that Congress intended to safeguard the discretion to employ voluntary race- and gender-conscious affirmative action as a means to allow "flexibility in modifying employment systems to comport with the purposes of Title VII." 29 C.F.R. 1608.1(c).

■ A court must give substantial deference to all enforcing agency's reasonable explications of a statute. *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, ——, 115 S.Ct. 810, 813, 130 L.Ed.2d 740 (1995) ("It is well settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with enforcement of the statute."); *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *U.S. v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). Courts have not hesitated to show deference to agencies in the context of a preemption analysis. The Supreme Court, for example, in finding that a South Dakota statute was preempted by the federal Payment in Lieu of Taxes Act, gave "substantial deference" to the Department of Interior's construction of the federal statute. *Lawrence County v. Lead–Deadwood School Dist.,* 469 U.S. 256, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985); *See also Retirement Fund Trust of Plumbing v. Franchise Tax Bd.,* 909 F.2d 1266, 1284–1286 (9th Cir.1990) (court places significant reliance on Treasury Department's interpretation of ERISA to find that federal law does not preempt California Employment Development Department's withholding procedure); *California Hosp. Ass'n v. Henning,* 770 F.2d 856 (9th Cir.1985) (modified, 783 F.2d 946 (9th Cir.1986)) (relying on Department of Labor's regulation clarifying Congress' intentions in adopting ERISA, court finds that California statute not preempted.); *cf. Southern Pacific Transp. Co. v. Public Service Com'n of Nevada,* 909 F.2d 352, 356 (9th Cir.1990) (appellate court reverses district court's preemption analysis because "district court failed to accord sufficient deference to the Department of Transportation's construction of its own regulations").

■ The Supreme Court has generally given the same level of deference to the EEOC's interpretations of Title VII as it gives to other agency interpretations of statutes they are charged with enforcing. For example, in *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 761, 99 S.Ct. 2066, 2074, 60 L.Ed.2d 609 (1979), the Supreme Court stated that the EEOC guidelines are entitled to "great deference." *See also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); *Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973); *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971). Those holdings were reaffirmed in *E.E.O.C. v. Commercial Office Products Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988) ("It is *axiomatic* that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards ... [it] need only be reasonable to

be entitled to deference.") (emphasis added).[43]

As explained below, the EEOC conclusion that Congress intended to preserve the option to utilize race- and gender-conscious affirmative action under Title VII surpasses the standard of reasonableness.[44] *See, e.g., Local No. 93, Intern. Ass'n of Firefighters, AFL–CIO C.L.C. v. City of Cleveland,* 478 U.S. at 516, 106 S.Ct. at 3072.

The EEOC's conclusion is based on a two-tiered rationale: (1) Congress intended voluntary compliance to be a purpose of Title VII, and (2) that the preservation of voluntary affirmative action is central to that compliance. The EEOC rationale is consistent with court decisions that have found that permitting voluntary compliance is integral to the purposes of Title VII. *Local No. 93,* 478 U.S. at 515, 106 S.Ct. at 3071 ("Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII."); *Weber,* 443 U.S. at 204, 99 S.Ct. at 2727–28 ("The very statutory words [were] intended as a spur or catalyst to cause 'employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history.' ").

The EEOC's corollary finding that voluntary affirmative action is not merely permissible, but essential to allow voluntary compliance is also buttressed by Supreme Court interpretation of Title VII. According to the Supreme Court, "the imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntarily their civil rights obligations. . . . This result would clearly be at odds with this Court's and Congress' consistent emphasis on 'the value of voluntary efforts to further the objectives of the law.' " *Wygant,* 476 U.S. at 290, 106 S.Ct. at 1855 (O'Connor, J., concurring); *accord Local 93,* 478 U.S. at 516, 106

43. In a subsequent case involving the EEOC guidelines, the Supreme Court drifted from its strong precedents requiring deference to agency interpretations. Justice Rehnquist, without reference to *Commercial Office Products* or the other post-*Chevron* holdings giving substantial deference to the EEOC guidelines, and solely drawing upon his own pre-*Chevron* opinion in *General Elec. Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), determined that "the level of deference afforded [to an EEOC Guideline] 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " *E.E.O.C. v. Arabian American Oil Co.,* 499 U.S. 244, 257, 111 S.Ct. 1227, 1235, 113 L.Ed.2d 274 (1991). Justice Scalia, concurring, reproaches Justice Rehnquist for disregarding the Court's precedent: "In an era when our treatment of agency positions is governed by *Chevron* the 'legislative rules v. other action' dichotomy of *Gilbert* is an anachronism; and it is not even a correct description of that anachronism to say that *Gilbert* held that the EEOC . . . is not entitled to deference." *Id.* at 260, 111 S.Ct. at 1236.

For the reasons that follow, this Court determines that, in this context, the EEOC Guidelines must be accorded, under the *Arabian Oil* test, the same substantial deference as required by *Commercial Office Products.* There is no evidence that the EEOC gave the two guidelines at issue here, which are comprehensive statements on Congress' intent regarding the use of affirmative action under Title VII, anything less than thorough consideration. The reasoning of the EEOC is coherent and is supported by the plain language and legislative history of the statute. In the thirty years since the passage of Title VII no agency interpretation of Title VII has drawn a conclusion inconsistent with those reached in the current EEOC guidelines. Finally the persuasive value of the guidelines at issued is enhanced by the fact that they function as a legal safe harbor for any person taking action in good faith reliance on the Guidelines. The Court finds that the EEOC Guidelines at issue here amply fulfil the requirements under *Arabian Oil* and must be given substantial deference.

44. The proposition that the EEOC Guidelines are indicative of Congress' intent is strengthened by the fact that Congress has made no effort to modify or overturn the Guidelines in the twenty years following their promulgation. This does not suggest that Congressional inaction is somehow determinative; the Supreme Court, however, has "often taken Congress' subsequent inaction as probative to varying degrees." *Patterson v. McLean Credit Union,* 491 U.S. 164, 200, 109 S.Ct. 2363, 2385, 105 L.Ed.2d 132 (1989) (Brennan, J., concurring in part, dissenting in part). In the context of Title VII, the Supreme Court has noted that the barriers of the legislative process do not adequately explain a failure of Congress to act. "[W]hen Congress has been displeased with our interpretation of Title VII, it has not hesitated to amend the statute to tell us so." *Johnson,* 480 U.S. at 629 n. 7, 107 S.Ct. at 1450 n. 7.

S.Ct. at 3072 (quoting EEOC guideline that states voluntary affirmative action must be "encouraged and protected" in the context of a finding that "Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII").

■ In sum, the EEOC Guidelines explicitly state that Congress intended to "encourage and protect" voluntary affirmative action as a method to achieve the objectives of Title VII. It is manifest from the Guidelines and the jurisprudence supporting their rationale that Congress meant to preserve the option to comply voluntarily with Title VII and that the capacity to utilize race- and gender-conscious affirmative action is fundamental to maintaining the potential of voluntary compliance. The EEOC's interpretation of Title VII compels this Court to find that Congress intended to preserve discretion for employers to utilize voluntary affirmative action.[45]

■ The Defendant–Intervenors argue that even if Congress intended to preserve the discretion to use race- and gender-conscious affirmative action under Title VII, Proposition 209 merely reflects California's decision not to exercise that discretion. The plain language of Title VII and the rationales behind voluntary affirmative action's role under the statute, however, necessitate the conclusion that Congress intended that the discretion to use race- and gender-conscious preferences be exercised employer level.

Congress created the alternative to use voluntary affirmative action as a method of voluntary compliance with Title VII that would not engender further liability. As noted on several occasions by the Supreme Court, Title VII could potentially have put employers in the untenable position between Title VII liability for past acts of discrimination and Title VII liability for future preferences to remedy discrimination. See, e.g., Wygant, 476 U.S. at 291, 106 S.Ct. at 1856 (O'Connor, J., concurring) ("[P]ublic employers are trapped between the competing hazards of liability to minorities if affirmative action is not taken to remedy apparent employment discrimination and liability to non-minorities if affirmative action is taken."); Weber, 443 U.S. at 210, 99 S.Ct. at 2730 (Blackmun, J., concurring) ("If Title VII is read literally, on the one hand [employers] face liability for past discrimination against blacks, and on the other they face liability to whites for any voluntary preferences adopted to mitigate the effects of prior discrimination against blacks.").

■ While the plain language of Title VII places employers between these equally perilous alternatives, voluntary affirmative action affords a safe passage. See Johnson, 480 U.S. at 645, 107 S.Ct. at 1459 (Stevens, J., concurring) ("The logic of antidiscrimination legislation requires that judicial constructions of Title VII leave 'breathing room' for employer initiatives to benefit members of minority groups."). It follows that Congress intended the persons or entities potentially liable under Title VII to be entrusted with the power to avail themselves of the safe passage provided by voluntary affirmative action.[46]

This conclusion is supported by the legislative history of Title VII. When enacting Title VII, Congress chose neither to mandate nor prohibit the use of affirmative action; instead it decided to leave determinations regarding the appropriateness of affirmative action to persons making the day-to-day employment decisions. "[T]he problems raised by these controversial questions [surround-

---

**45.** Recognizing the importance of the EEOC guideline in making this finding and the unique position held by the EEOC in interpreting Title VII, this Court invites the EEOC to submit an amicus brief.

**46.** Those liable under Title VII are limited to "employers." In general, an employer under Title VII is, at a minimum, a person who has a modicum of control over the statutorily required number of employees. See Magnuson v. Peak Technical Services, Inc., 808 F.Supp. 500 (E.D.Va.1992) (For the purposes of Title VII, "employer" encompasses those persons who control aspects of individual's compensation, terms, conditions, or privileges of employment.); Ryals v. Mobile County Sheriff's Dept., 839 F.Supp. 25 (S.D.Ala.1993) (Alabama County not employer of deputy sheriff under Title VII absent evidence that county had any control over any area of deputy's employment. Fact that county issued checks for deputies was insufficient to confer employer status.).

ing preferential treatment and quotas in employment] are more properly handled at a governmental level closer to the American people and by communities and individuals themselves." *Weber,* 443 U.S. at 207 n. 7, 99 S.Ct. at 2729 n. 7 (quoting 110 Cong.Rec. 15893 (1964)); *Local 93,* 478 U.S. at 520, 106 S.Ct. at 3074 (quoting H.R.Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 29 (1962)) (noting that key support for Title VII was only obtained after it was apparent that "management prerogatives, and union freedoms [were] to be left undisturbed to the greatest extent possible").[47]

The State of California is not subject to employer liability under Title VII for all past and present discriminatory actions taken against all state, local, and municipal public employees in the state nor does the State of California make the day-to-day decisions regarding the public employees in California. As a result, Congress could not have intended that the State of California would be the appropriate body to exercise, on behalf of every individual public employer in California, the discretion to use voluntary race- and gender-conscious affirmative action.

### c. Conclusion

In light of the EEOC Guideline and supporting case law, we conclude that Congress intended to protect employers' discretion to utilize race- and gender-conscious affirmative action as a method of complying with their obligations under Title VII. Proposition 209, by eliminating the discretion to utilize race-

and gender-conscious affirmative action, contravenes this Congressional purpose. Further, Congress intended to allow employers to use affirmative action as a safe passage to compliance with Title VII. Proposition 209 obstructs the passageway and forces many employers into a place akin to the Strait of Messina where they confront the Scylla of Title VII and Charybdis of Proposition 209. Proposition 209, therefore, also contravenes Congress' intent regarding the use of affirmative action as a method to achieve the goals of Title VII.

For these reasons, this Court finds that plaintiffs have demonstrated a likelihood of prevailing on the theory that Proposition 209 violates the Supremacy Clause under the doctrine of obstacle preemption.[48]

### 3. Preemption of State Law by Titles VI and IX

Plaintiffs further contend that Proposition 209 violates the Supremacy Clause by interfering with the purposes and methods of Titles VI and IX. In order to establish a likelihood of prevailing on this theory, plaintiffs must show, just as they must show in the Title VII context, that Congress intended to accord voluntary race- and gender-conscious affirmative action a hallowed position within the structure of Titles VI and IX.

As in the Title VII context, nothing on the face of Titles VI or IX indicates that Congress intended to maintain voluntary affirmative action under the two statutes.[49] As

---

**47.** While these legislative comments occurred during the 1964 enactment of Title VII when it covered only private employers, "there is also no indication that Congress intended to leave governmental employers with less latitude under Title VII than had been left to employers in the private sector when Title VII was originally enacted." *Local 93,* 478 U.S. at 520 n. 10, 106 S.Ct. at 3074 n. 10.

**48.** Subdivision (h) of Proposition 209 states "[i]f any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit. Any provision held invalid shall be severable from the remaining portions of this section." The Court recognizes that Title VII only applies to employment relationships, while Proposition 209 applies

to employment, contracting, and education. It would be premature, however, to address questions regarding severance at this preliminary stage of the proceedings.

**49.** The legislative history of Title VI contains one reference to the importance of voluntary compliance with the statute, but does not address whether voluntary affirmative action is central to compliance with Title VI. *See* H.R.Rep. No. 914(II), 88th Cong., 1st Sess. 25–26 (1964); H.R.Rep. No. 914(I), 88th Cong. 1st Sess. 25 (1964). The Supreme Court has only examined affirmative action under Titles VI and IX in limited contexts. Two pluralities have held that Title VI is not violated by a constitutionally permissible affirmative action program. *Fullilove v. Klutznick,* 448 U.S. 448, 492 n. 77, 100 S.Ct. 2758, 2781 n. 77, 65 L.Ed.2d 902 (1980) (opinion of Burger, C.J.); *id.* at 517, n. 15, 100 S.Ct. at

noted above, where a statute is silent, a court must look for guidance from the agencies charged with enforcing the statute. Agency interpretations of Titles VI and IX have addressed some aspects of affirmative action, but have not reached the question of whether Congress intended the statutes to preserve the option of using voluntary affirmative action.

Agency regulations, on the one hand, state that in some instances, Title VI and IX regulations *require* the use of affirmative action, "[i]n administering a program which the recipient has previously discriminated against persons ... the recipient must take affirmative action to overcome the effects of prior discrimination." 34 C.F.R. § 100.3(b)(6)(i); 34 C.F.R. § 106.3(a) ("[i]f the Assistant Secretary finds that a recipient has discriminated against persons on the basis of sex ... such recipient shall take such remedial action as the Assistant Secretary deems necessary to overcome the effects of such discrimination.").

A showing that affirmative action is, at times, required under Title VI and IX cannot support a finding of preemption. Failure to comply with Titles VI and IX generally results in a cessation of federal funds. Consequently, affirmative action that is required by Titles VI and IX is permissible under Proposition 209. CAL. CONST. art. 1, § 31(e) ("Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state."). Because Proposition 209 allows required actions under Titles VI and IX no conflict could transpire between actions required by the statutes and Proposition 209.

The regulations interpreting Title VI and IX also discuss the *permissive* use of affirmative action. "Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative

action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin." 34 C.F.R. § 100.3(b)(6)(ii); 34 C.F.R. § 106.3(b) ("[i]n the absence of a finding of discrimination on the basis of sex ... a recipient may take affirmative actions to overcome the effect of conditions which resulted in limited participation therein by persons of a particular sex.").

The mere fact that affirmative action is permissible under the Title VI and IX regulations, and some judicial interpretation, does not require preemption of a state law that prohibits affirmative action. Simply obstructing an action that is allowed under federal law does not, in itself, raise preemption concerns unless there is some showing that the action is necessary to fulfilling the purposes of the federal law. The plain language and agency interpretations of Titles VI and IX do not establish that any Congressional purposes are thwarted by Proposition 209.

Recognizing the shortcomings of the typical sources of Congressional intent regarding the role of voluntary affirmative action under Titles VI and IX, plaintiffs attempt to employ interpretations of Title VII as a means to elucidate the legislative intent behind Titles VI and IX. It is apparent, however, that the intent and purposes of Titles VI and IX, which must be the central focus for preemption purposes, are not identical to those of Title VII. When Title VI was passed, "Congress was legislating to assure federal funds would not be used in an improper manner. Title VII, by contrast, was enacted pursuant to the commerce power.... Title VII and Title VI, therefore, cannot be read *in pari materia*" in all contexts. *Weber*, 443 U.S. at 206 n. 6, 99 S.Ct. at 2729 n. 6. Likewise, Title IX was enacted under Congress' spending power and also

2794, n. 15 (Powell, J., concurring); *id.* at 517, n. 1, 100 S.Ct. at 2795, n. 1 (Marshall, J., concurring); *Bakke*, 438 U.S. at 287, 98 S.Ct. at 2746–47 (opinion of Powell, J.); *id.* at 341, n. 17, 98 S.Ct. at 2775 n. 17 (Brennan, J., concurring in part, dissenting in part). In the context of Title

IX, the First Circuit recently determined that "[l]ike other anti-discrimination statutory schemes, the Title IX regime permits affirmative action." *Cohen v. Brown University*, 101 F.3d 155 (1st Cir.1996).

cannot be read as precisely parallel to Title VII.[50]

It is especially clear that plaintiffs cannot rely on Title VII to establish Congress' intent regarding Titles VI and IX in the context of affirmative action. The Supreme Court has already noted that Congress had differing intentions for what constitutes permissible affirmative action under the three statutes: "[W]e do not regard as identical the constraints of Title VII and the Federal Constitution on voluntarily adopted affirmative action plans." *Johnson*, 480 U.S. at 632, 107 S.Ct. at 1452. Meanwhile, the constraints of Title VI parallel those established by the Constitution. *Bakke*, 438 U.S. at 285, 98 S.Ct. at 2745–46. Further, unlike under the Title VI paradigm, the standard for what constitutes permissible affirmative action under Title IX cannot be based on current Constitutional limitations.[51]

The statutory language, agency interpretation, and legislative history of Titles VI and IX do not establish that Congress intended to preserve voluntary race- and gender-conscious affirmative action as an option for entities covered by the two statutes. It is apparent, moreover, that plaintiffs cannot rely on the methods Congress chose to effectuate Title VII to establish that Proposition 209 is preempted by Titles VI and IX. Consequently, plaintiffs have failed to demonstrate to the Court a likelihood of success on the merits of their claim that Proposition 209 violates the Supremacy Clause because it stands as an obstacle to the methods Congress intended entities to employ in furthering the purposes of Titles VI and IX.

**C. Irreparable Injury**

As noted above, plaintiffs have demonstrated a probability of success on the merits of their equal protection claim. They have also demonstrated a likelihood of success on one of their preemption claims. Although some courts have held that this showing sufficiently demonstrates a possibility of irreparable harm, *see, e.g., Bery v. City of New York*, 97 F.3d 689, 693–94 (2d Cir.1996), the Court will separately address this issue, focusing both on the irreparability and the immediacy of the harm alleged by plaintiffs.

Where the deprivation of a constitutional right is involved, courts generally hold that no further showing of irreparability is required. *See Associated Gen. Contractors*, 950 F.2d at 1412; 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1. The Court is satisfied, at least with respect to plaintiffs' equal protection claim, that the deprivation of a constitutional right—"the right to full participation in the political life of the community"—is squarely at issue in the present case. *Seattle*, 458 U.S. at 467, 102 S.Ct. at 3193. To the extent Proposition 209 imposes a new and substantial political burden on those, and only those, who support race- and gender-conscious affirmative action, it inflicts an immediate and ongoing injury that is not amenable to monetary remedy. The very real threat that the enforcement and implementation of Proposition 209 may lead to the dismantling of existing, otherwise constitutional, affirmative action programs also constitutes an irreparable harm to members of the plaintiff class.

Turning to the imminence of the alleged injury, the Court is also satisfied that plaintiffs have shown that injury to members of the plaintiff class is not only possible, but almost certain, in the absence of a prelimi-

---

**50.** Plaintiffs footnote two Ninth Circuit cases and several regulations which adopt Title VII's disparate impact test in the context of Titles VI and IX. *Larry P. v. Riles*, 793 F.2d 969 (9th Cir.1984); *Jeldness v. Pearce*, 30 F.3d 1220 (9th Cir.1994). While this may show that comparable actions will engender liability under Titles VI, VII, and IX, it does not reveal Congress' intent regarding the role of voluntary affirmative action under the three statutes.

**51.** Congress' intent regarding affirmative action under Title IX was manifested when the statute was enacted in 1972—well in advance of the currently controlling Constitutional standard of heightened scrutiny for gender classifications. *See U.S. v. Virginia*, —— U.S. at ——–——, 116 S.Ct. at 2275–2276 (tracing history of heightened scrutiny for gender classifications). Consequently, unlike Title VI, where Congress intended to track the standards of the Fourteenth Amendment, Congress could not have intended to import the Fourteenth Amendment standards for gender into Title IX.

nary injunction. Proposition 209 is self-executing, and thus immediately binding on all state and local governmental units. The defendant class representatives, Governor Wilson and Attorney General Lungren, have, for their part, made plain their intention to implement Proposition 209 as expeditiously as possible, and have taken a number of preliminary steps to that end. The University of California system has also indicated its intention, in the absence of a preliminary injunction, to implement Proposition 209 immediately. Other members of the defendant class have also announced their intention, in the absence of an injunction, to modify their activities in accordance with Proposition 209. In addition, a number of private suits have been brought against defendant class members in state court challenging existing affirmative action programs, including suits brought by Governor Wilson and defendant-intervenor CADP. Perhaps most importantly, the Court notes that the core equal protection injury identified by plaintiffs—impaired access to the political process at all levels of state and local government—would, in the absence of a preliminary injunction, be felt by the plaintiff class immediately.

 The balance of hardships, moreover, tips decidedly in plaintiffs' favor. In contrast to the injury outlined above, a preliminary injunction would impose little hardship on members of the defendant class, who would merely be required to suspend their Proposition 209 implementation plans pending trial.[52]

 The public interest also favors the entry of a preliminary injunction. As an initial matter, a number of named defendants have urged this Court to act swiftly and give clear guidance with respect to Proposition 209. This request, of course, is neutral with respect to the granting or denial of the present motion. Nonetheless, the Court believes the preservation of the pre-election status quo not only serves the public need for plain guidance, but also harmonizes that interest with the compelling interest in remedying discrimination that underlies existing constitutionally-permissible state-sponsored affirmative action programs threatened by Proposition 209.

## VI. CONCLUSION

Based on the foregoing Findings and Conclusions, this Court rules that:

(1) Plaintiffs have standing to bring this action.

(2) Plaintiffs have demonstrated a probability of success on their claim that Proposition 209 violates the Fourteenth Amendment's equal protection guarantee to full participation in the political life of the community.

(3) Plaintiffs have failed to demonstrate a likelihood of success on their claim that Proposition 209 violates the Supremacy Clause because it conflicts with, and thus is preempted by, Titles VI and IX of the 1964 Civil Rights Act.

(4) Plaintiffs have demonstrated a likelihood of success on their claim that Proposition 209 violates the Supremacy Clause because it conflicts with, and thus is preempted by, Title VII of the 1964 Civil Rights Act.

(5) Plaintiffs have demonstrated that a preliminary injunction is necessary to protect the plaintiff class from the possibility of irreparable injury.

Accordingly, and good cause appearing, it is HEREBY ORDERED pursuant to FED. R.CIV.P. 65 that defendants Governor Pete Wilson and Attorney General Dan Lungren and all members of the defendant class that they represent, and their officers, agents, servants, employees and attorneys, and those in active concert or participation with them, are restrained and enjoined, pending trial or final judgment in this action, from implementing or enforcing Proposition 209 insofar as said amendment to the Constitution of the State of California purports to prohibit or affect affirmative action programs in public

---

**52.** Defendants argue that a state has a strong interest in seeing that legitimate enactments, especially at the constitutional level, not be stymied. Defendants certainly cannot, however, contend that the state has a strong interest in enforcing a measure that violates the United States Constitution. Because that is the very issue of the present suit, defendants invocation of this strong state interest is somewhat premature.

employment, public education or public contracting.

The aforesaid preliminary injunction shall not preclude the following:

1. all defendants, including members of the defendant class, from identifying, reviewing and analyzing existing affirmative action programs.[53]

2. all defendants, including members of the defendant class, from defending private actions seeking remedies under Article 1, section 31 of the California Constitution.

3. proceedings in pending state court actions related to Article 1, section 31, including, *Wilson v. State Personnel Bd.*, Sacramento County Superior Court No. 96 CS01082 and *Californians Against Discrimination and Preferences, Inc. v. The Bd. of Governors of the Calif. Community Colleges*, Sacramento County Superior Court, No. 96 CS03010, and

4. the California Attorney General from defending Article 1, section 31 in any legal proceeding challenging its validity under the United States Constitution.[54]

**IT IS SO ORDERED.**

---

53. The preliminary injunction does not, of course, interfere with the ability of any defendant or member of the defendant class to *voluntarily* adopt, retain, amend or repeal an affirmative action program. It does preclude any defendant or member of the defendant class from taking any action with respect to an affirmative action program in order to enforce, implement, or otherwise comply with, Proposition 209.

54. Defendants have not requested that plaintiffs post a bond pursuant to FED.R.CIV.P. 65(c). This Court agrees that in this case it is appropriate to waive the bond requirement. *See generally Crowley v. Local No. 82*, 679 F.2d 978, 1000 (1st Cir.1982); *Canterbury Career School, Inc. v. Riley*, 833 F.Supp. 1097, 1106 (D.N.J.1993).